# MORRIS *v*. FRAKER.

*(Supreme Court of Colorado, March, 1880—Appeal from County Court of El Paso County.)*

STOCK AND FENCE LAWS. The common law of England, in regard to a close, having never been applicable to this country, it was not the intention of the legislature, in the adoption of the common law as far as "applicable," to adopt that part relating to fences.

The general right of owners to allow stock to run at large, has been recognized by the legislature, and in the absence of special acts, owners of crops can only recover damages for the trespass of cattle when the domain at the time of the trespass was inclosed by good and sufficient fence.

JUDICIAL NOTICE—WHEN NOT TAKEN AS TO LAWS. "An act concerning fences and inclosures in the state of Colorado," providing that it shall only be applicable in those counties where adopted by a vote of the people at a general election, the court will not take judicial knowledge of such vote. This is a fact which should be proved and preserved in the bill of exceptions, like any other fact in the case.

BECK, J. This was an action instituted by Fraker, the plaintiff below, to recover damages for injuries done to his growing crops of grain and potatoes by the cattle of the appellant.

The trial was by the court, a jury being waived by the parties, and resulted in the finding and judgment for the plaintiff in the sum of $100.

The defendant, Morris, offered to prove that the fence which inclosed the plaintiff's land was wholly insufficient to turn ordinary stock running at large upon the range, and that it was not such a fence as is required by law.

Plaintiff's counsel objected to the testimony, but it was received under a stipulation of opposing counsel, that the court might subsequently exclude it, and not consider it in the decision of the case.

At the conclusion of the testimony produced upon the trial, plaintiff's counsel renewed the objection to the testimony concerning the condition of the fence, and it was excluded by the court, to which ruling defendant's counsel excepted, and now assigns the same for error.

The appellant's counsel took the position that the law of this state permits the owners of cattle to let them run at large, and that unless the fence surrounding the plaintiff's inclosure comes up to the requirements of the first section of the act of March 22, 1877, entitled, "An act concerning fences and inclosures in

the state of Colorado," (General Laws, page 461,) there can be no lawful recovery.

As the case is presented *ex parte*, we are not informed of the position of the appellee, further than as contained in the objection interposed by his counsel to the evidence offered in the court below. This objection was, "that by law the plaintiff was not bound to fence against or inclose his lands against stock running at large in this state."

In regard to the statute cited by counsel for appellant, we cannot say, in the present condition of this record, that it affords the proper standard by which to test the sufficiency of the plaintiff's fence, for the reason that it does not appear from the bill of exceptions that this statute has been adopted in El Paso county by a vote of the people at a general election, as required by the act. This is a fact of which we cannot take judicial notice, but which should be proved and preserved in the bill of exceptions, like any other fact in the case. The objection upon which the evidence concerning the sufficiency of the fence was excluded, raises the question whether the rule of the common law in respect to closes, and the trespasses of domestic animals thereon, is in force in this state; or whether the general law of the state permits the owners of such animals to allow them to run at large, being responsible only for damages done by them upon lands inclosed by good and sufficient fences.

At common law the owner of a close was not bound to fence against the adjoining close, except by the force of prescription. Every man's land, in the eye of the law, was inclosed and set apart from his neighbor's land, if not by a visible and material fence, by an invisible boundary existing in contemplation of law. Every unwarrantable entry upon the soil of another, whether by a man's cattle or by himself, constituted a trespass by the breaking of his close. Every one was bound to keep his beasts within his own close, and if they went upon the grounds of others, the owners were liable in damages, unless they could show that the lands trespassed upon should have been fenced, either by prescription, agreement or assignment. 3 Bl. Com., pp. 209, 211; 1 Addison Torts, Secs. 375, 379.

An act was passed by the first legislative assembly of the late territory of Colorado, which declared " that the common law of England, so far as the same is of a general nature, together with

all acts and statutes of the British parliament, made in aid of or to supply the defects of the common law, prior to the fourth year of James I, (excepting the second section of the sixth chapter of 43 Elizabeth, the eighth chapter of 13 Elizabeth, and ninth chapter of 37 Henry VIII,) which are of a general nature, and not local to that kingdom, shall be the rule of decision, and shall be considered as of full force until repealed by legislative authority." Acts 1861, p. 35.

This act was repealed in 1868, and afterwards, at the same session, re-enacted, with the additional limitation that the common law was adopted as far as "applicable," and of a general nature, etc. R. S. 1868, p. 105.

The latter act is still in force, and it is probable that the objection to the introduction of testimony concerning the condition and sufficiency of plaintiff's fence, was made and sustained at the trial, on the theory that the common law rule upon this subject was in force in this state by virtue of that statute.

It must be apparent, however, to any person at all familiar with the character of the country, its soil and climate, and with the material interests and industrial pursuits of the people, that such a rule of law is wholly unsuited and inapplicable to the present condition of the state and its citizens.

The total area of the state is upwards of 66,000,000 of acres, a small proportion of which is arable land. Of this vast body the mountains comprises nearly two-thirds and the plains somewhat more than one-third; and while the soil of the latter is generally adapted to agriculture, only a small part is, as yet, available for such use, owing to the insufficient supply of water for irrigation, without which grain and vegetables will not grow thereon in this climate.

I have no information as to the quantity of land now under cultivation in the state. The auditor's report shows that a little over 2,000,000 acres were returned by the assessors of the several counties in 1880, as being liable to taxation. This is supposed to embrace all agricultural, meadow and timbered lands for which patents have been issued up to the date of the last assessments, and it may be inferred that the number of acres under cultivation is much less than these figures. The agricultural and meadow lands are for the most part situated in the valleys, and adjacent to the streams which flow out from the mountains, while

the immense tracts of unwatered lands lie out as commons, un-improved, and available for grazing purposes only.

These commons and the numerous parks in the mountains furnish excellent grass for horses, cattle and other animals, and stock raising, in consequence, has become one of the leading industries of the state. The returns from the several counties show that there were in 1880 more that one and one-half millions of cattle, horses, mules and other domestic animals liable to taxation in the state. This industry would be seriously crippled by the adoption of a rule requiring each owner to keep his stock within his own close. It would be impracticable, as well as impossible, for the several owners of these animals to provide and inclose suitable pasture lands for their herds. Nor is there any necessity for such a rule. The commons are now owned principally by the state and by the general government, and if the grasses which grow thereon are not depastured, they will waste and decay. And while it is impracticable to purchase and fence sufficient pasture lands for the stock, the tillage and meadow lands can be fenced, and, in point of fact, are now enclosed in nearly all parts of the state.

It does not answer these objections to say that stock may be herded upon the unenclosed lands, and thus be prevented from trespassing upon cultivated lands, for herding stock upon the lands of others would be in violation of the common law. Herd laws, if desirable, must be enacted by legislative authority.

Another consideration which shows the necessity for fences, and at the same time that the English law is unsuited to our conditions and circumstances, is the fact that all animals which range upon the plains are compelled to go to the streams for water. The farm and meadow lands being usually upon the banks and in the immediate vicinity of the streams, experience has shown that it is impossible to prevent cattle and other animals coming to the streams to drink, from trespassing and feeding upon the succulent grains and tasteful herbage of the farms and gardens, when the same are not protected by fences. The fencing of such lands is therefore a necessity.

We are also of opinion that the legislation of the state has been inconsistent with the rule of the common law upon this subject, which goes to show that it has not been relied upon as the law of the state by the law-making power.

The first legislative assembly that convened after the adoption of the constitution passed a stock law, which, among other things, provided penalties against those who should wrongfully drive or lead animals from their usual range; it enacted sundry provisions respecting marks and brands; declared that all neat stock over one year old found running at large without a mother, and having neither brands nor ear-marks, should be deemed *marvoricks*, and might be taken in charge by the captain or foreman of a legal round-up, and sold under regulations therein specified; and it authorized the county commissioners of the several counties to order that cattle be gathered together, or rounded-up, once a year in their respective counties.

This act plainly recognizes the general right of owners to suffer their stock to run at large, with the exception of hogs, which are expressly prohibited under fines and penalties. General Laws 1877, p. 854.

This was equally true of the territorial legislation on this subject, for, while many local acts applicable to certain counties were passed, restraining the running at large of stock at certain stated times, the general tenor of the legislation recognized the fact that domestic animals were free commoners.

It is also to be observed that whenever the citizens of one or more counties desired to restrain stock from running at large during the growing season, or otherwise, they did not rely upon the common law, but resorted to the legislature and procured a restraining act applicable to such county or counties, as the session laws of the several sessions held from 1861 to 1877 abundantly testify.

Among the various territorial acts which might be referred to as inconsistent with the common law, is an act of 1864, prescribing what should constitute a lawful fence in the territory, from the operation of which, however, certain counties were excepted, until they should, by a vote, ratify it. In 1868 a law was passed prohibiting horned cattle from running at large in certain counties, unless branded. Several acts were passed at different dates, prohibiting the running at large of inferior bulls and stallions, some of them including rams and boars. In 1874 an act was passed providing that no stallion should be allowed to run at large in the territory except with a band of not less than ten mares, and another which provided that a person owning twenty-

five or more cows, should not let them run at large without pro-
viding and letting run at large with them not less than one bull
of good American graded stock.

Laws were also passed by the territorial legislature establishing
fence districts, providing for common fields, regulating the mark-
ing and branding of stock, providing for round-ups, and making
it a criminal offense to wrongfully drive stock from its usual range.
This legislation was evidently based upon the theory that owners
of cattle, etc., were authorized by the general laws in force, to
permit them to go at large and gain their subsistence wherever
they could upon uninclosed lands.   Such legislation is wholly
inconsistent with the old English law, which required no fences,
but obliged the owner of stock to keep his animals at all times
within his own close.

Why enact that cattle should not be permitted to run at large
unless branded, or that cows should not run at large unless ac-
companied by graded bulls, or mares without stallions, or why
provide for annual round-ups of stock, if a general law was in
force which prevented such animals from running at large at any
season, or under any circumstances?  And why make provisions
for common fields, fence districts, and specifying what shall consti-
tute a lawful fence, if, under the law, no fences were required?
On this theory such legislation would not only be useless, but
absurd as well.

The truth is, that, except as restrained by local acts, citizens of
Colorado have always exercised the right of permitting their ani-
mals to range upon the commons and unoccupied lands, and this
right has been universally conceded by the people, and recognized
by their law-makers.

In an early day, in those portions of the state where many per-
sons were unable to fence their farming lands in consequence of
the great expense of fencing materials, the legislature afforded the
people relief from the effect of the general law by the passage of
herd laws and other special acts, which were confined in their
operation to specified localities, and usually to certain months of
the year.   It is evident from the character of the legislation, of
both territory and state, that the laws of England have never
been applicable to the condition of this section of the country,
and hence, were not adopted by the legislature in the act adopt-
ing the common law, so far as applicable.   It follows, therefore,

that if the general law permits the running at large of domestic animals, the right to recover damages for their trespasses to crops, where no local or special laws are in force, depends upon the sufficiency of the fences by which they are inclosed to turn stock.

It was held in *Boyer* v. *Sweet*, 3 Scam., 121, and in *Seeley* v. *Peters*, 5 Gil., 130, that in adopting the common law in the state of Illinois it was only adopted wherein it was applicable to the habits and condition of the society, and in harmony with the genius, spirit and objects of the institutions of the state, and that the provisions of the common law, requiring the owner of cattle and other animals to keep them on his own land, was never in force in that state.

The same reasoning was employed, and the same ruling adopted by the courts of Connecticut, Ohio and California, and, in our opinion, equally apply to Colorado. Certainly, the condition of this state is as illy adapted to the common law doctrine as either of the states named. *Stadwell* v. *Ritch*, 14 Con., 293; *Kerwacker* v. *The Cleveland, Columbus & Cincinnati Railroad Company*, 3 Ohio State, 172; *Waters* v. *Moss*, 12 California, 535; *Logan* v. *Gedney*, 38 California, 579.

The court remarked in the Ohio case, in considering the effect of the common law rule, "If an action for damages be maintainable for every instance in which cattle and other live stock of a person go upon the inclosed lands of another, without express license, more than nine-tenths of the business men of the state become for this cause *tort feasors* every day of the year, and liable to suit for damages."

To a certain extent the same would be true of our own citizens if the doctrine were held applicable to this state; and this consideration of itself furnishes the *reductio ad absurdum* of the proposition.

We must therefore hold that the general law of the state permits the owners of cattle to allow them to range at will, and that in the absence of local acts, the owners of crops can only recover damages done thereto by the trespasses of cattle, when the same are, at the time of the trespass, inclosed by good and sufficient fences.

The court below therefore erred in excluding the testimony offered upon the trial, showing the condition of the plaintiff's fence.

If the statute of 1877, prescribing what shall constitute a law-

ful fence in this state, has been adopted in El Paso county, then such a fence as therein required, must be proved. If the act has not been adopted in that county, then, to entitle the plaintiff to recover for damage done to his crops by cattle running at large upon the range, he must prove that his crops were inclosed by a fence sufficient to turn ordinary stock.

The judgment is reversed, and the cause remanded.