The **STATE of Colorado and the Colorado Department of Highways, Petitioners,**

v.

**David J. MOLDOVAN, Respondent.**

**No. 91SC769.**

Supreme Court of Colorado, En Banc.

Dec. 14, 1992.

Gale A. Norton, Atty. Gen., Gregg E. Kay, First Asst. Atty. Gen., Simon P. Lipstein, Asst. Atty. Gen., Denver, for petitioners.

Bragg, Baker & Cederberg, P.C., James A. Cederberg, Denver, for respondent.

Kathleen E. Haddock, Denver, for amicus curiae Colorado Mun. League.

Harding & Ogborn, James M. Edwards, Denver, for amicus curiae Colorado Trial Lawyers Ass'n.

Justice QUINN delivered the Opinion of the Court.

In *Moldovan v. State*, 829 P.2d 481 (Colo. App.1991), the court of appeals reversed a summary judgment entered by the district court against the plaintiff, David J. Moldovan, and in favor of the defendants, the State of Colorado and the Colorado Department of Highways, on Moldovan's tort claim for injuries sustained when his motorcycle collided with a cow on a state highway. The district court ruled that, although Molodovan's claim was not barred by the Colorado Governmental Immunity Act, §§ 24-10-101 to -120, 10A C.R.S. (1988), the state owed no duty to Moldovan because, in its view, section 35-46-111 of the Colorado Fence Law, §§ 35-46-101 to -114, 14 C.R.S. (1984), did not manifest a legislative intent to create a private right of action for the violation of the legislatively imposed obligation on the state to maintain a right-of-way fence along or adjacent to a state highway. In reversing the summary judgment and remanding the case for further proceedings, the court of appeals agreed that Moldovan's claim was not barred by the Colorado Governmental Immunity Act, but held that section 35-46-111 of the Fence Law imposed a duty on the state to maintain fences adjacent to its highways in order to "keep the highways safe for motorists such as plaintiff." 829 P.2d at 484. We granted the State of Colorado's and the Department of Highways' petition for certiorari to determine whether the court of appeals properly decided those issues. We affirm the judgment of the court of appeals with respect to Moldovan's tort claim based on the theory of general negligence, as distinguished from negligence per se, against the state defendants.

I.

On August 29, 1987, David Moldovan was driving his motorcycle westbound on Colorado Highway 96, a federal-aid highway,[1] when a cow ran onto the highway from adjacent land. Moldovan struck the cow and sustained personal injuries in the collision. Moldovan brought suit against the State of Colorado and the Colorado Department of Highways (the state).[2] Ac-

---

1. A federal-aid highway is a highway for which the federal government contributes matching funds for the construction, alteration, repair, or improvement of the highway.

2. In 1991 the Department of Highways was renamed the Department of Transportation, ch. 188, sec. 4, § 24-1-110(1), 1991 Colo.Sess.Laws 1019, 1054-55, and the Division of Highways is

cording to Moldovan's complaint, the cow was owned by Edward F. Reese and had been in a pasture adjacent to the highway, but the fence separating the highway from the pasture was in disrepair, enabling the cow to gain access to the highway. Moldovan claimed that the state failed to properly maintain the right-of-way fence adjacent to the highway, that its failure to do so was a violation of section 35–46–111 of the Fence Law and constituted negligence and negligence per se, and that the state's negligence was the cause of the cow's entry onto the highway and the ensuing collision and injuries sustained by Moldovan. The state, as relevant here, denied the allegations of negligence and alleged that Moldovan's complaint failed to state a claim for relief.

After answering the complaint, the state moved for summary judgment on the ground that Moldovan's complaint was barred by the Colorado Governmental Immunity Act, §§ 24–10–101 to –120, 10A C.R.S. (1988), and that Moldovan's complaint failed to state a claim under the theory of either general negligence or negligence per se because the Fence Law does not create a private cause of action against the state for injuries sustained by a highway user. The district court granted the motion for summary judgment. Although the court acknowledged that there was a genuine issue of fact concerning whether, for purposes of the Governmental Immunity Act, the condition of the fence constituted a dangerous condition which physically interfered with the movement of traffic on the highway, the court ruled that the Fence Law did not create a private civil remedy for personal injuries caused to a highway user.

Moldovan appealed to the court of appeals, which reversed the judgment of the district court. The court of appeals agreed with the district court that Moldovan's complaint was not barred by the Colorado Governmental Immunity Act, but reversed the district court's determination that section 35–46–111 of the Fence Law does not cre-

ate a cognizable tort claim against the state and remanded the case to the district court for further proceedings. We granted the state's petition for certiorari to consider whether Moldovan's claim is barred by the Colorado Governmental Immunity Act and whether, if not barred, section 35–46–111 of the Fence Law creates a private tort remedy for a motorist injured by the state's negligence in failing to maintain a right-of-way fence adjacent to a state highway. We address these questions in turn.

## II.

The state argues that the intent of the Governmental Immunity Act is to hold public entities responsible only for injuries caused by a failure to maintain safe conditions on a highway surface and not for injuries caused by conditions which are not an integral part of the highway itself, such as the failure to maintain a fence adjacent to the highway. We reject the state's contention.

### A.

■ The Colorado Governmental Immunity Act, §§ 24–10–101 to –120, 10A C.R.S. (1988), was enacted in 1971 to reestablish the doctrine of sovereign immunity for public entities following this court's abrogation of the doctrine in *Evans v. Board of County Comm'rs*, 174 Colo. 97, 482 P.2d 968 (1971). We have held that the immunity created by the Governmental Immunity Act, being in derogation of the common law, must be strictly construed. *See City of Aspen v. Meserole*, 803 P.2d 950, 955 (Colo.1990); *Bloomer v. Boulder County Bd. of Comm'rs*, 799 P.2d 942, 946 (Colo. 1990); *Stephen v. City and County of Denver*, 659 P.2d 666, 668 n. 3 (Colo.1983). Strict construction of the scope of legislatively created immunity is consistent with one of the basic but often overlooked purposes of the Governmental Immunity Act— that is, to permit a person to seek redress for personal injuries caused by a public entity. *Woodsmall v. Regional Transp. Dist.*, 800 P.2d 63, 69 (Colo.1990).

now the Highway Operations and Maintenance Division of the Department of Transportation,

ch. 188, sec. 1, § 43–1–114, 1991 Colo.Sess.Laws 1019, 1039–40.

The crux of the Governmental Immunity Act critical to this case are the versions of sections 24–10–106(1)(d) and 24–10–103(1), 10A C.R.S. (1988), which were enacted in 1986 and were in effect on August 29, 1987, when Moldovan was injured while driving his motorcycle on the state highway.[3] Section 24–10–106(1)(d), in relevant part, states:

> Sovereign immunity is waived by a public entity in an action for injuries resulting from:
>
> *    *    *    *    *    *
>
> A dangerous condition of a public highway, road, or street which physically interferes with the movement of traffic on the paved portion ... of any public highway, road, [or] street.... As used in this section, the phrase "physically interferes with the movement of traffic" shall not include traffic signs, signals, or markings, or the lack thereof, but shall include the failure to repair a stop sign or a yield sign which reassigned the right-of-way or the failure to repair a traffic control signal on which conflicting directions are displayed, if such failure constituted a dangerous condition as defined in section 24–10–103(1).

Section 24–10–103(1), to which section 24–10–106(1)(d) expressly refers, defines a "dangerous condition" as follows:

> "Dangerous condition" means a physical condition of a facility or the use thereof which constitutes an unreasonable risk to the health or safety of the public, which is known to exist or which in the exercise of reasonable care should have been known to exist and which condition is proximately caused by the negligent act or omission of the public entity in constructing or maintaining such facility. For the purposes of this subsection (1), a dangerous condition should have been known to exist if it is established that the condition had existed for such a period of time and was of such a nature that, in the exercise of reasonable care, such condition and its dangerous character should have been discovered.[4]

In *Stephen v. City and County of Denver*, 659 P.2d 666, we considered whether an improperly placed stop sign at the intersection of a city street constituted a dangerous condition on a public street. The *Stephen* case arose out of the prior versions of sections 24–10–106(1)(d) and 24–10–103(1), 10 C.R.S. (1982). Section 24–10–106(1)(d) stated that sovereign immunity was waived for "[a] dangerous condition which interferes with the movement of traffic on the traveled portion and shoulders or curbs of any public highway, road, [or] street," and section 24–10–103(1) defined a "dangerous condition" as "the physical condition of any public ... highway, road, or street ... where the physical condition of such facilities or the use thereof constitutes a risk to the health or safety of the public." In concluding in *Stephen* that the improperly placed stop sign constituted "a dangerous condition which interferes with the movement of traffic," we reasoned as follows:

> The apparent purpose of the general assembly in not extending sovereign immunity to actions for injuries resulting from dangerous conditions of roads or streets was to make governments liable for failure to maintain those facilities in a condition safe for public use. Thus, the dangerous conditions for which a government is to be liable are those "which [interfere] with the movement of traffic," section 24–10–106(1)(d), and "dangerous condition" is defined to extend to

---

**3.** In 1992, the General Assembly amended section 24–10–106(1)(d) and section 24–10–103(1). Ch. 172, §§ 24–10–106(1)(d) and 24–10–103(1), 1992 Colo.Sess.Laws 115–16. We express no opinion on what effect these amendments would have on a tort claim based on factual circumstances similar or identical to those involved in this case.

**4.** Prior to the 1986 amendments to the Governmental Immunity Act, section 24–10–103(1), 10 C.R.S. (1982), listed the "facilities" to which the definition of "dangerous condition" applied as "any public building, public hospital, jail, public highway, road, or street, public facility located in any park or recreation area maintained by a public entity, or public water, gas, sanitation, electrical, power, or swimming facility." The 1986 amendment to section 24–10–103(1) eliminated the listing of specific facilities.

those physical conditions of roads or highways that affect their use in a way that "constitutes a risk to the health or safety of the public." Section 24–10–103(1). This legislative emphasis on maintenance of roads and highways in a condition that promotes the safe movement of traffic reflects concern that those facilities function in a way consistent with that purpose. The necessity of stop signs to regulate traffic flow in the interest of public safety needs no elaboration. Viewing a road and street system functionally, it is apparent that stop signs are integral parts of roads and highways. We believe that to construe "dangerous condition" to be limited to the physical condition of the road surface gives too cramped a reading to the statute and ignores the purpose for which this exception to sovereign immunity was created.

659 P.2d at 668 (footnote omitted).

In 1986 the General Assembly recast 24–10–106(1)(d) to provide that sovereign immunity is waived for "a dangerous condition of a public highway ... which physically interferes with the movement of traffic on the paved portion" of the highway, and also to provide that the term "physically interferes with the movement of traffic" shall not include "traffic signs, signals, or markings, or the lack thereof." The intended effect of these 1986 amendments was to nullify our decision in *Stephen* that an improperly placed stop sign at a city street intersection constituted a "dangerous condition which interferes with the movement of traffic." It does not follow from these amendments, however, that a dangerous condition on a public highway that "physically interferes with the movement of traffic on the paved portion" of the highway is limited only to those dangerous

conditions that have their physical source in the highway surface itself. Such a construction, in our view, cannot be squared with the statutory text adopted by the General Assembly in 1986.

The 1986 version of section 24–10–106(1)(d) incorporates by reference the definition of "dangerous condition" in section 24–10–103(1). The term "dangerous condition," as defined in the 1986 version of section 24–10–103(1), means the "physical condition of a facility or the use thereof" that constitutes an unreasonable risk to public safety and was known or reasonably should have been known to the public entity. If the General Assembly intended to limit the meaning of "dangerous condition of a highway" in section 24–10–106(1)(d) to a physical condition originating in the highway surface, we cannot reasonably explain why it expressly waived immunity in those situations where injuries result from a public entity's failure to repair a stop sign, a yield sign, or a traffic signal—all of which are intended to protect highway users but rarely constitute a portion of the road surface.[5]

■ Our discussion in *Stephen* of the functionally integrated character of a highway system, involving as it does not only the road surface but also other safety devices that may be physically separated from the road surface, remains as true today as it was in 1983. Consistent with the principle that a legislative grant of sovereign immunity must be strictly construed, we conclude that, exclusive of the "traffic signs, signals, or markings, or the lack thereof" expressly set forth in section 24–10–106(1)(d), an improperly maintained safety device that is an integral part of a state highway system may constitute a dangerous condition on the highway that physically interferes with the movement of

5. Our analysis of the statutory text of the 1986 version of section 24–10–106(1)(d) finds support in the legislative hearings conducted before the State Affairs Committee of the House of Representatives with respect to the proposed amendments to the statute. These hearings focused on the elimination of traffic signs as the basis for governmental liability, in response to our decision in *Stephen v. City and County of Denver,* 659 P.2d 666 (Colo.1983), and also on whether a

public entity should have a duty to construct sidewalks or walkways along public roads, in response to our decision in *Wheeler v. County of Eagle,* 666 P.2d 559 (Colo.1983). There was no discussion on whether a dangerous condition on a public highway or road should be limited to a physical defect in the surface of the highway itself. *See* Transcript, Hearings Before State Affairs Committee, February 4 and 6, 1986.

traffic on the paved portion of the highway and, thus, may be the basis of a tort claim against the public entity responsible for maintaining the device. *Cf. Schlitters v. State*, 787 P.2d 656, 658 (Colo.App.1989) (remarking that dangerous condition on highway may exist if public entity fails to maintain roadside so as to avoid presence of obstructions on travelled portion of highway).

### B.

In this case, Moldovan alleged in his complaint that the state's failure to maintain a right-of-way fence adjacent to the state highway caused the fence to be in a state of disrepair and enabled a cow to run onto the highway, thereby creating a dangerous condition that physically interfered with the movement of traffic and caused serious injuries to Moldovan as he travelled on the paved portion of the highway. In our view, Moldovan's claim qualifies as a claim for injuries resulting from a dangerous condition of a public highway that physically interferes with the movement of traffic on the paved portion of the highway, for which sovereign immunity is expressly waived pursuant to section 24–10–106(1)(d) of the Governmental Immunity Act. We add, however, that the effect of a waiver of governmental immunity is merely to allow the liability of the public entity to "be determined in the same manner as if the public entity were a private person." § 24–10–107, 10A C.R.S. (1988). We must determine, therefore, whether the state's failure to maintain a right-of-way fence adjacent to a state highway, as alleged in Moldovan's complaint, renders the state liable in a private tort action for injuries sustained by a highway user. The answer to that question depends on the nature and extent of the state's duty under the Fence Law, §§ 35–46–101 to –114, 14 C.R.S. (1984), and it is to that statute that we now turn.

### III.

The state argues that before a public entity can be held liable in tort for a violation of a statutory duty, the statute creating the duty must clearly evince a legislative intent to create a private tort remedy for redressing the breach of the statutory duty and that the Fence Law does not manifest the requisite legislative intent to create a private tort remedy for bodily injuries. When we consider the nature of the statutory duty involved in this case and the purpose sought to be achieved by that duty, we conclude that the state can be held liable in tort on a theory of general negligence as distinguished from negligence per se.

### A.

A review of the Fence Law is necessary as a prelude to our resolution of the cognizability of Moldovan's tort claim. The Fence Law was enacted in 1877 and modified the common law rule that an owner of a trespassing animal was strictly liable for any harm caused by the animal during the trespass. *See generally* W. Keeton, D. Dobbs, R. Keeton, and D. Owen, *Prosser & Keeton on Torts*, § 76 at 538–41 (5th ed. 1984). Because the conditions in Colorado were such that it was more practical and far less costly to require farmers to "fence-in" farm land, which comprised only about two million of Colorado's sixty-six million acres, rather than to require ranchers to "fence-in" their livestock, the common law rule of strict liability was not adopted in this state. *Morris v. Fraker*, 5 Colo. 425, 428–29 (1880). The Fence Law provided that a person may recover for damages to land and crops caused by trespassing livestock if, as a condition precedent to recovery, the person suffering the damages maintained a fence in good repair. § 35–46–102(1), 14 C.R.S. (1984).[6] "Livestock" is

---

**6.** In *Schaefer v. Mills*, 72 Colo. 82, 84, 209 P. 643, 644 (1922), the court, in discussing the Fence Law, stated:

The policy of the law is to favor stockowners, and permit them to range their stock at large. The duty of protecting crops is placed upon the farmer. The evident purpose of the act is to require crops to be protected by a fence, which will ordinarily turn stock, and so prevent stockowners from being harried by suits because of the trespass of their stock in

defined as "horses, cattle, mules, asses, goats, sheep, swine, buffalo, and cattalo." § 35–46–101(2), 14 C.R.S. (1984). In 1935 the General Assembly amended the Fence Law by adding section 35–46–111, 14 C.R.S. (1984), which is central to this case and states as follows:

It is the duty of the division of highways to maintain right-of-way fences along and adjacent to all federal aid highways constructed by the division, where such highways are maintained by the division. On all state or federal aid highway road construction projects where the division of highways constructs a right-of-way fence along and adjacent to such construction project, in whole or in part, it is the duty of the division to maintain the same.[7]

■ Because the statute does not set forth the purpose of the statutory duty, the state contends that the legislative purpose was to benefit owners of land adjacent to the highway. We are of the view that the statutory text of section 35–46–111, when analyzed in the context of the overall structure of the Fence Law, offers convincing evidence that the primary purpose of imposing an affirmative duty on the Division of Highways to maintain a right-of-way fence along and adjacent to a highway is to protect highway motorists from the danger of injuries resulting from a collision with trespassing livestock.

Although some provisions of the Fence Law define the responsibility for constructing and maintaining fences between adjacent landowners in order to protect their respective lands from trespassing livestock, §§ 35–46–112 and 113, 14 C.R.S. (1984), it would strain logic to reason, on that basis, that the purpose of section 35–46–111 is to protect the highway surface against tres-

passing animals. We also believe that if the protection of livestock against highway traffic was the primary purpose of the statute, as distinguished from an arguably secondary purpose, the General Assembly most likely would have imposed the duty of "fencing-in" the livestock upon the livestock owner. That the safety of highway users is a primary purpose of section 35–46–111 finds support in the Colorado Division of Highways Manual of Maintenance Procedure, which states in relevant part:

Highway fences are as important as any other safety devices on the highway and thus so is their maintenance. Placement of a fence not only outlines the limits of the right-of-way, but also keeps humans and animals away from hazardous areas. Careful inspection and routine maintenance should not be neglected. The Colorado Open Range Law requires the Department to fence stock out. All fences except decorative fences are the responsibility of the Highway Department.

Colorado Division of Highways' Manual of Maintenance Procedure, Ch. 11, section 11.6 (1990). While we are not bound by a governmental agency's interpretation of a statutory duty imposed on the agency, the agency's interpretation of its own statutory responsibility is certainly entitled to some consideration in determining the legislative purpose. *See Colorado Common Cause v. Meyer,* 758 P.2d 153, 159 (Colo.1988); *Van Pelt v. State Bd. for Community Colleges,* 195 Colo. 316, 323, 577 P.2d 765, 770 (1978). We conclude that the primary purpose of the statutory duty created by section 35–46–111 is to protect highway motorists from the danger of trespassing livestock.[8]

### B.

Having determined that the primary purpose of section 35–46–111 is one of public

---

cases where the crops are insufficiently protected.

**7.** Section 35–46–111 was amended in 1989, ch. 306, sec. 1, § 35–46–111, 1989 Colo.Sess.Laws 1408, and again in 1991, ch. 188, sec. 58, § 35–46–111, 1991 Colo.Sess.Laws 1019, 1074. We express no opinion concerning the effect of these amendments on a tort claim based on factual circumstances similar or identical to the facts of this case.

**8.** In so concluding, we agree with the view expressed by Judge Kelly in her dissenting opinion in *Biella v. State Dept. of Highways,* 652 P.2d 1100, 1104 (Colo.App.1982) (Kelly, J., dissenting), *aff'd,* 672 P.2d 529 (Colo.1983), that the likely purpose served by section 35–46–111 is "to protect motorists on the highway from the danger of trespassing livestock wandering into their path and causing an accident."

safety, we now must resolve whether a violation of the statutory duty imposed on the Division of Highways can serve as the basis of a highway motorist's tort claim in negligence. The state, relying primarily on our decision in *Board of County Comm'rs v. Moreland,* 764 P.2d 812 (Colo.1988), contends that the Fence Law does not evince the requisite legislative intent to create a civil remedy for violation of the duty imposed on the state to maintain a fence along a state highway. Although the state's argument has some force, we ultimately find it unpersuasive.

In *Moreland,* the plaintiff, who was visiting a friend at the friend's cabin, fell from the deck of the cabin due to the absence of a guardrail in violation of La Plata County's Uniform Building Code, which the Board of County Commissioners adopted pursuant to the statutory authority granted to counties by section 30–28–201(1), 12A C.R.S. (1986). Under the La Plata County Code, building inspectors were responsible for inspecting newly constructed buildings for code compliance. The county inspector, however, either failed to make the required inspection or overlooked the missing guardrail on the cabin deck from which Moreland fell. Moreland filed an action against La Plata County, claiming that the county was negligent in failing to require the cabin owner to construct a guardrail in conformity with the requirements of the county building code. A jury found in favor of Moreland, and the court of appeals affirmed the judgment. We reversed the judgment, reasoning that "before a private civil liability remedy will be recognized for injuries resulting from a breach of obligations legislatively imposed on a governmental entity and unknown at common law, a clear expression of legislative intent must be found," and then concluded that neither the building code nor the resolution by which the county adopted the code contained any indication that a private civil remedy was contemplated for negligent vi-

olations of the code by the county. 764 P.2d at 818. We found support for our conclusion in the fact that the state statute authorizing a county to enact a building code contains specific remedies against entities violating the code, but made no provision for the imposition of civil liability against a county. *Id.* at 818–19.

In *Moreland,* we drew upon our prior decision in *Quintano v. Industrial Comm'n,* 178 Colo. 131, 495 P.2d 1137 (1972), in which we rejected a tort claim by a worker against the Industrial Commission for injuries suffered from a machine which allegedly had not been properly inspected by the commission in compliance with its statutory duty, codified in C.R.S. 1963, § 80–2–1, to inspect all factories and machinery in which laborers are employed "for the purpose of protecting said employees ... against damages arising from imperfect or dangerous machinery." In affirming the dismissal of Quintano's complaint, we held that, in the absence of a clear expression of legislative intent to create a private tort remedy, the statutory duty imposed on the commission could not support a negligence claim against the commission. 178 Colo. at 135–36, 495 P.2d at 1138–39.[9]

We acknowledge that the holdings of *Moreland* and *Quintano* might be viewed as far-reaching when read in isolation. We are satisfied, however, that both decisions, when measured against the particular circumstances of the instant case, are not controlling on the issue before us. The legislative scheme in those cases did not impose a direct duty upon the public entity to take some action to ensure public safety on property over which the public entity had a possessory or proprietary interest. Rather, both *Moreland* and *Quintano* involved the public entity's "regulatory" or "inspection" responsibility for determining whether a private party in possession of the property was in compliance with the applicable legislative standards with respect to the property. *Moreland* and

**9.** In *Quintano,* we formulated the issue as whether the statutory duty imposed on the Commission "is public or is for the actionable benefit of an individual," 178 Colo. at 135, 495 P.2d at 1138, but we ultimately resolved that question on the basis of legislative intent. We abandoned the public duty doctrine in *Leake v. Cain,* 720 P.2d 152 (Colo.1986), and remarked that "*Quintano* left the validity of the doctrine in this state in considerable doubt." *Id.* at 157.

*Quintano* thus stand for the proposition that when a legislative scheme creates a regulatory duty on a public entity to ensure that a private party is in compliance with safety regulations, the public entity will not be subject to civil tort liability for injuries sustained by a person as a result of the public entity's failure to comply with its regulatory duty in the absence of an express legislative intent to create a civil tort remedy for such injuries. As we emphasized in *Moreland* and *Quintano*, the issue of a civil tort remedy is ultimately a question of legislative intent. 764 P.2d at 820.[10]

In contrast to the regulatory responsibilities imposed on the public entities in *Moreland* and *Quintano*, section 35–46–111 imposes a direct duty upon the Division of Highways to maintain a right-of-way fence adjacent to a state highway maintained by the division. The concern for public safety underlying that duty, along with and reinforced by the legislative waiver of sovereign immunity over the years for injuries resulting from a dangerous condition on a public highway, constitutes a sufficiently expressed legislative intent to create a private tort remedy against the Division of Highways for a highway motorist who sustains injuries in a collision with livestock trespassing onto the highway through an allegedly defective right-of-way fence for which the division was responsible for maintaining.

### C.

■ In order to provide necessary direction to the trial court on remand of this case, we elect to address whether the state can be held answerable in tort on a theory of negligence per se. Under the theory of negligence per se, the violation of a statutory duty conclusively establishes negligence on the part of a defendant. *See generally* W. Keeton et al., *Prosser & Keeton on Torts*, § 36, at 229–30 (5th ed. 1984). We set forth the elements of a negligence per se claim in *Lyons v. Nasby*, 770 P.2d 1250, 1257 (Colo.1989), as follows:

> In Colorado the violation of an ordinance adopted for the public's safety may be negligence per se if it is established that the violation proximately caused the injury. *See Lambotte v. Payton*, 147 Colo. 207, 363 P.2d 167 (1961); *Hertz Driv–Ur–Self System, Inc. v. Hendrickson*, 109 Colo. 1, 121 P.2d 483 (1942). The plaintiff must also show that he or she is a member of the class of persons whom the statute was intended to protect and that the injuries suffered were of a kind that the statute was enacted to prevent. *[Largo Corp. v.] Crespin*, 727 P.2d [1098], at 1108 [Colo.1986]; *Dunbar v. Olivieri*, 97 Colo. 381, 50 P.2d 64 (1935).

Thus, under the theory of negligence per se the state's failure to maintain the right-of-way fence would conclusively establish negligence irrespective of the reasonableness of the state's conduct in attempting to carry out its statutory responsibility.

The difficulty with the applicability of the negligence per se theory of liability to

---

**10.** Although the Fence Law adopts a number of statutory procedures and remedies for redressing damages caused to land and crops by trespassing livestock, *see, e.g.,* § 35–46–103, 14 C.R.S. (1984) (providing for discretionary arbitration of damage claims); § 35–46–105, 14 C.R.S. (1984) (creating misdemeanor penalty for knowingly allowing livestock to graze or run at large in areas separated from range land by fence); § 35–46–108, 14 C.R.S. (1984) (creating lien for damages in favor of person taking trespassing animal into custody), these procedures and remedies are not exclusive nor preemptive of a common law tort action for personal injuries caused by trespassing livestock. In *Robinson v. Kerr*, 144 Colo. 48, 355 P.2d 117 (1960), for example, this court held that the Fence Law, although barring a suit by a landowner for damages to land and crops caused by trespass-

ing livestock under circumstances where the claiming landowner did not have a lawful fence, was not intended to bar an action by a minor against the owner of a trespassing horse which kicked the minor and caused the loss of the minor's eye. *See also Millard v. Smith*, 30 Colo. App. 466, 495 P.2d 234 (1972) (Fence Law no bar to negligence claim by a motorist against livestock owner for personal injuries sustained in colliding with cow that wandered onto state highway). Moreover, the fact that section 35–46–111 does not expressly address the issue of a private tort remedy is readily understandable. When that section was adopted in 1935, sovereign immunity was the prevailing doctrine in the state, and there would have been no reason for the General Assembly to use a section of the Fence Law as the vehicle for abrogating that doctrine.

Moldovan's claims has its source in the language of the Governmental Immunity Act. Section 24–10–106(1)(d), 10A C.R.S. (1988), waives sovereign immunity for injuries resulting from a "dangerous condition" on a public highway that physically interferes with the movement of traffic on the paved portion of the highway.[11] Section 24–10–103(1), 10A C.R.S. (1988), defines a dangerous condition as a physical condition constituting an unreasonable risk of harm to public safety which the public entity knew or in the exercise of reasonable care should have known to exist, and then goes on to state:

> For the purposes of this subsection (1), a dangerous condition should have been known to exist if it is established that the condition had existed for such a period of time and was of such a nature that, in the exercise of reasonable care, such condition and its dangerous character should have been discovered.

The effect of section 24–10–103 is to require a claimant suing a public entity for injuries caused by a dangerous condition on a public highway to prove, as an element of a negligence claim, that the public entity reasonably knew or should have known of the dangerous condition. When section 24–10–103(1) of the Governmental Immunity Act is read in conjunction with section 35–46–111 of the Fence Law, it is clear that Moldovan's claim against the state must be resolved under general principles of negligence and not on the basis of the theory of negligence per se.

We accordingly affirm the judgment of the court of appeals and remand the case to that court with directions to return the case to the district court for further proceedings consistent with the views herein expressed.

11. For purposes of the negligence per se theory of liability, there is no question that section 35–46–111 was enacted for the purpose of protecting the safety of highway users. Nor is there any question that Moldovan is within the class of persons whom the statute was intended to protect and suffered the same kind of injuries that the statute was intended to prevent.