**LARRY H. MILLER CORPORATION–DENVER, d/b/a Larry Miller Toyota, and Universal Underwriters Insurance Company, Plaintiffs–Appellants,**

v.

**URBAN DRAINAGE AND FLOOD CONTROL DISTRICT and L. Scott Tucker, in his official capacity, Defendants–Appellees.**

No. 01CA2268.

Colorado Court of Appeals, Div. IV.

Jan. 2, 2003.

Mendenhall DelPiccolo Ragland & Potrykus, Robert D. Mendenhall, Denver, Colorado, for Plaintiffs–Appellants.

Warnquist & Associates, Scott P. Landry, Greenwood Village, Colorado, for Defendants–Appellees.

Opinion by Judge DAVIDSON.

In this negligence action, plaintiffs, Larry H. Miller Corporation–Denver (Miller Toyota) and Universal Underwriters Insurance

Company, appeal from the trial court judgment dismissing their complaint against defendants, Urban Drainage and Flood Control District and L. Scott Tucker, in his official capacity (collectively the District), for failure to state a claim for relief. We affirm.

The District is a special district created by the Urban Drainage and Flood Control Act (UDFCA) to coordinate the efforts of municipalities and counties in the Denver metropolitan area to control stormwater flows and flooding. *See* § 32–11–102, C.R.S.2002.

In 1992, the District hired an engineering firm to produce a master plan of the outfall systems' plan of the area where Miller Toyota (the property) is located. The master plan was intended to analyze the hydraulic, hydrologic, and existing stormwater systems' capacity and to develop alternative plans to handle stormwater flows to minimize safety hazards and damage resulting from flooding of streets and private property.

The master plan identified an intermittent flooding problem on the property and identified problems with the Page Gulch system draining water from the property south to Clear Creek. The plan noted that the system's existing capacity was insufficient to handle major storm flows.

The master plan also noted the plan of the Colorado Department of Transportation (CDOT) to reconstruct the southbound ramp from I–25 to westbound U.S. 36, which borders the southeast corner of the property. The master plan recommended that preliminary plans for the reconstruction should be factored into the final outfall systems' plan for the area because the ramp would further increase the risk of flooding on the property. The master plan evaluated the creation of various stormwater detention facilities, including condemnation of the property for use as a detention facility or, alternatively, the creation of a new storm sewer under the ramp to U.S. 36.

In 1998, CDOT prepared a drainage study for the ramp. The study noted that "most of the [m]aster [p]lan improvements would be required to solve the long-term flooding risk to the [property]."

Miller Toyota purchased the property in 1998, and thereafter, CDOT built the new highway ramp. CDOT did not implement any of the proposals in the study or the master plan. In 1999, a rainstorm caused severe flooding on the property, resulting in damages in excess of $525,000, the amount Universal paid pursuant to Miller Toyota's insurance policy. Miller Toyota claimed as additional damages its insurance deductible, uncovered losses and expenses, and losses due to business interruption.

Alleging negligence in the design, approval, inspection, construction, operation, and maintenance of public highways and water and sanitation facilities, plaintiffs brought this action against the District, Adams County, and CDOT. The latter entities are not parties to this appeal. As to the District, plaintiffs allege that it was required to take affirmative steps to decrease the risk of flooding caused by CDOT's construction of the highway ramp.

The District filed a motion to dismiss on the bases that plaintiffs' claims sought to impose duties upon it beyond those legislatively mandated and that the action was barred by the Colorado Governmental Immunity Act (GIA).

The trial court did not address the District's governmental immunity defense, but granted the motion to dismiss pursuant to C.R.C.P. 12(b)(5) on the grounds that the General Assembly did not impose upon the District the affirmative duties sought by plaintiffs, nor did it provide a private remedy for failure to perform those duties.

I.

Plaintiffs contend that the trial court erred in dismissing their complaint. We agree with the result reached by the trial court, but resolve the case on governmental immunity grounds.

■ In determining the viability of a claim against a governmental entity alleged, as here, to have breached a statutory duty, the court must determine first whether an exception to the GIA applies and, if so, whether the plaintiff has a private cause of action pursuant to the statute. *See State Dep't of*

*Highways v. Mountain States Telephone & Telegraph Co.*, 869 P.2d 1289 (Colo.1994); *State v. Moldovan*, 842 P.2d 220 (Colo.1992).

■ Thus, we must address initially whether governmental immunity has been waived. Because the issue is one of subject matter jurisdiction, the proper procedure to determine sovereign immunity is set forth by C.R.C.P. 12(b)(1), and not C.R.C.P. 12(b)(5). *See Medina v. State*, 35 P.3d 443 (Colo.2001). Here, the trial court did not address the issue of governmental immunity or hold a C.R.C.P. 12(b)(1) hearing. Nevertheless, the parties addressed the issue in the trial court and in their briefs on appeal. On the pleadings before us, we can determine, as a matter of law, whether sovereign immunity is waived for the damages alleged in plaintiffs' complaint. *See Trinity Broadcasting of Denver, Inc. v. City of Westminster*, 848 P.2d 916 (Colo.1993).

We conclude that, under the circumstances here, there has been no waiver of sovereign immunity. Thus, we need not determine whether the UDFCA provides a private remedy.

## II.

■ Plaintiffs argue that, pursuant to the exception set forth in § 24-10-106(1)(f), C.R.S.2002, governmental immunity has been waived for damages to the property caused by the District's negligent operation and maintenance of the parking lot "detention pond," the Page Gulch system, and the concrete-lined channel under the highway ramp that connects the two. The District contends that it neither operated nor maintained the highway ramp nor any other facility on the property and had no duty to do so. We agree with the District that its immunity was not waived.

■ The GIA provides that sovereign immunity is waived in an action for injuries resulting from a public entity's "operation and maintenance" of a public sanitation facility. *See* § 24-10-106(1)(f). Thus, to fall within this exception, a plaintiff must show that the defendant is a public entity which was negligent in the operation and maintenance of a sanitation facility. *See deBoer v.*

*Ute Water Conservancy District*, 17 P.3d 187 (Colo.App.2000). The waiver provisions of the GIA are to be interpreted broadly. *See Medina v. State, supra.*

Here, it is undisputed that the District is a "public entity." *See* § 24-10-103(5), C.R.S. 2002 (public entity includes political subdivision organized pursuant to law); § 32-11-102(1)(d), C.R.S.2002 (district created by UDFCA is a political subdivision).

Furthermore, the structures at issue—the parking lot "detention pond," the Page Gulch drainage system, and the concrete-lined channel—are all devices used in the collection and drainage of storm water. Thus, we will assume, without deciding, that these structures are "sanitation facilities" within the meaning of the GIA. *See Scott v. City of Greeley*, 931 P.2d 525 (Colo.App.1996)(storm sewer); *Smith v. Town of Estes Park*, 944 P.2d 571 (Colo.App.1996)(cross-pan); *Burnworth v. Adams County*, 826 P.2d 368 (Colo. App.1991)(storm drain); *see also* § 32-1-103(18), C.R.S.2002 ("sanitation district" defined); § 30-20-401(4), C.R.S.2002 ("sewerage facilities" defined); *City of Colorado Springs v. Powell*, 48 P.3d 561 (Colo.2002).

■ The critical issue, then, concerns the term "operation," which is defined in the GIA as "the act or omission of a public entity . . . in the exercise and performance of the powers, duties, and functions vested in [it] by law with respect to the purposes of [the] facility." Section 24-10-103(3)(a), C.R.S.2002. Although the GIA does not define "maintenance," the broad definition of "operation" has been interpreted to include the concept of maintenance. *See City of Colorado Springs v. Powell, supra.*

Here, plaintiffs acknowledge that the District has no proprietary or ownership interest in either the property or the drainage systems at issue. Plaintiffs argue, nonetheless, that the District's failure to coordinate with CDOT in building the new highway ramp, which raised the flood risk on the property, and its failure to implement specific portions of the master plan which would have prevented or reduced the risk of flooding on the property, constitute "operation and maintenance" pursuant to the GIA. Specifically, cit-

ing the definition of "facilities" set forth in § 32–11–104(24)(a), C.R.S.2002, plaintiffs argue that despite the absence of an ownership interest or contract to operate, the District is responsible for the operation and maintenance of the "detention pond," the Page Gulch system, and the concrete channel because these structures are used in connection with the District's drainage and flood control system. We do not agree.

The UDFCA defines "facilities" as:

the drainage and flood control system of the [District] consisting of all properties, real, personal, mixed, or otherwise, *owned or acquired by the [D]istrict* through purchase, construction, or otherwise and used in connection with such system of the [D]istrict, and in any way pertaining thereto, whether situated within or without its limits, or both within and without its limits.

Section 32–11–104(24)(a)(emphasis added).

Here, because it is undisputed that the properties at issue are not owned and have not been acquired by the District, they do not constitute "facilities" and therefore are not part of the District's "drainage and flood control system" as defined in the UDFCA.

Furthermore, contrary to plaintiffs' contention, the District's statutory responsibilities in this regard are confined to properties owned or acquired by the District. *See* § 32–11–102(1)(a), C.R.S.2002 (District is required to operate and maintain property it has acquired for the benefit of the people of the district); *cf. City of Longmont v. Henry–Hobbs,* 50 P.3d 906 (Colo.2002)(irrigation ditch maintained and used by city as part of its storm drainage system); *Scott v. City of Greeley, supra* (storm drainage system built by city); *Smith v. Town of Estes Park, supra* (cross-pan maintained by town); *Burnworth v. Adams County, supra* (storm drain part of system owned by county).

Moreover, the term "operation" in the GIA must not be construed to include "[a] failure to exercise or perform any powers, duties, or functions not vested by law in a public entity." Section 24–10–103(3)(b)(I), C.R.S.2002. Here, the District is not "vested by law" with a responsibility to own or acquire any particular property or to implement improvements suggested in the master plan.

Plaintiffs are correct that the UDFCA's overarching purpose is the creation of the District to coordinate the efforts of other agencies to control flooding in the Denver area. *See* § 32–11–102. However, nothing in the UDFCA requires the District to own, operate, or maintain any drainage facilities or to acquire property to protect it from flooding.

To the contrary, by its terms, the UDFCA grants to the District the discretion to choose which properties to acquire, condemn, improve, operate, and maintain. *See* § 32–11–220(1)(m), C.R.S.2002 (District may "exercise all or any part or combination of the powers granted in [the UDFCA]"); § 32–11–104(24)(b), C.R.S.2002 (board may determine the facilities of the District); § 32–11–104(24)(a) ("facilities" consist of property "owned or acquired by the [D]istrict ... and used in connection with such [flood control] system of the [D]istrict"); §§ 32–11–218(1)(e), (f), C.R.S.2002 (District has power to adopt, amend, repeal, enforce, and administer rules and regulations as it deems necessary or convenient for the operation and maintenance of its facilities and any other flood control facilities under its control); § 32–11–219(1)(c), C.R.S.2002 (District has power to enter into contracts with other parties to operate their drainage and flood control facilities for a fee, when determined by District to be in public's best interest); § 32–11–219(1)(g)(I), C.R.S.2002 (District has power to contract for joint use of facilities owned by another public body, as may be determined by District).

The General Assembly's intention that the District determine how best to allocate its resources is confirmed by the financial powers and limitations imposed upon the District. *See* § 32–11–217, C.R.S.2002 (financial powers of district); § 32–11–501(1), C.R.S. 2002 ("Upon the conditions and under the circumstances set forth in this section, the [District] ... may borrow money to defray the cost of any project designated by the board ...."); § 32–11–217(1)(c)(I), C.R.S. 2002 (not more than one-tenth of a mill shall be used for engineering and operations of the

District, not more than four-tenths of a mill shall be used for capital construction, and not more than four-tenths of a mill shall be used for maintenance and preservation of floodways).

The UDFCA also specifically limits the District's ability to incur debt to three percent of the valuation of taxable property within the District. Thus, in determining whether to acquire, condemn, operate, or maintain a particular property, the District must consider the cost of such a project. *See* § 32–11–534, C.R.S 2002; *see also* § 32–11–104(12), C.R.S.2002 ("cost" of a project includes cost of any property deemed by the District "to be necessary or useful and convenient therefor").

We conclude, therefore, that the General Assembly did not intend to require the District to acquire—by purchase, construction, contract, or otherwise—all inadequate facilities within the District, as plaintiffs suggest, even if it was aware of flooding caused by such facilities. *See* § 2–4–201(1), C.R.S.2002 (it is presumed that a just and reasonable result, feasible of execution, is intended).

For the same reasons, we disagree with plaintiffs' contention that the permissive language of the UDFCA must be read to impose mandatory duties upon the District.

▮ Generally, the General Assembly's use of the term "may" is indicative of a discretionary power to choose among alternatives. *See, e.g., People v. Triantos,* 55 P.3d 131 (Colo.2002). While the term "may" sometimes imposes a mandatory duty, it is generally deemed to be permissive absent evidence of legislative intent to the contrary. *See People v. Kilgore,* 992 P.2d 661 (Colo. App.1999).

Here, as discussed, nothing in the statute indicates that the General Assembly intended that the powers conferred upon the District be construed as an affirmative duty to remedy a particular situation.

*People ex rel. Rollins v. Board of County Commissioners,* 7 Colo.App. 229, 42 P. 1032 (1895), and *Board of Supervisors v. United States,* 71 U.S. (4 Wall.) 435, 18 L.Ed. 419 (1866), relied on by plaintiffs, do not say otherwise. In those cases, the courts interpreted permissive language in ordinances to require that the local government levy taxes to pay their debts. Reiterating that the legislature's intent determines whether a statutory provision involves mere discretion or imposes a mandatory duty, the courts determined that the ordinances were not intended to leave a creditor without a remedy against the county. Here, however, we discern no such legislative intent to deviate from the plain meaning of the discretionary terms used in the UDFCA.

Plaintiffs contend that, nevertheless, even absent a statutory duty, the "vested by law" component of the definition of "operation" is satisfied by a showing that the District has a common law duty to act with reasonable care, which was invoked when the District became involved in the master plan.

However, unlike in *Farmers Group, Inc. v. Williams,* 805 P.2d 419 (Colo.1991), upon which plaintiffs rely, here the District had no preexisting common law duty to act. To the contrary, the duties plaintiffs seek to enforce could only be derived from the statutory powers conferred upon the District by the UDFCA. *See* § 32–11–101, et seq., C.R.S. 2002; *see also Board of County Commissioners v. Moreland,* 764 P.2d 812 (Colo. 1988)(duty to protect plaintiff from injury did not exist prior to adoption of statute). And, as discussed, the UDFCA does not impose upon the District the duties alleged by plaintiffs.

We conclude, therefore, that although the District may in its discretion choose to contract with CDOT, Adams County, or Miller Toyota to acquire their property or drainage systems, it has no statutory or common law duty to do so. *Cf. State v. Moldovan, supra* (law imposes direct duty on division of highways to maintain fences adjacent to state highways).

Consequently, the alleged failure of the District to take affirmative steps to decrease the risk of flooding caused by CDOT's construction of the ramp was not the exercise of "powers, duties, and functions vested in it, by law," *see* § 24–10–103(3), and therefore, the District did not "operate or maintain" a sanitation facility within the meaning of § 24–10–

106(1)(f) of the GIA. Accordingly, sovereign immunity was not waived.

The judgment is affirmed.

Judge VOGT and Judge CRISWELL * concur.

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24–51–1105, C.R.S.2002.