**Jerry MEDINA; Mary Medina; and Terri Hawkins, Petitioners,**

v.

**STATE of Colorado; Colorado State Highway Patrol; and State of Colorado Department of Transportation, Respondents.**

**No. 00SC747.**

Supreme Court of Colorado,
En Banc.

Nov. 27, 2001.

---

Miranda & Alonzi, P.C., Christopher A. Miranda, Ronald A. Podboy, Denver, CO, Attorneys for Petitioners Jerry Medina and Mary Medina.

Harding & Associates, P.C., Phil Harding, Jeffrey Pederson, Denver, CO, Attorneys for Petitioner Terri Hawkins.

Ken Salazar, Attorney General, Elizabeth A. Weishaupl, First Assistant Attorney General, Friedrick C. Haines, Assistant Attorney General, Litigation Section, Tort and Complex Litigation Unit, Denver, CO, Attorneys for Respondents.

Justice RICE delivered the Opinion of the Court.

In this case, we clarify the relationship between "maintenance" and "design" under the Colorado Governmental Immunity Act ("CGIA" or "Act"), CGIA § 24–10–101 to – 120, 7 C.R.S. (2001), thereby demarcating the scope of the state's duty to maintain a public highway. Plaintiffs, Terri Hawkins and Jerry and Mary Medina, were passengers on a charter bus traveling through Clear Creek Canyon on U.S. Highway 6 when a large boulder dislodged from a "cut slope" above the road and crashed through the roof, severely injuring Ms. Hawkins and Mr. Medina. Mr. Medina later died from his injuries. Ms. Hawkins and the Medinas each brought separate actions against the State of Colorado, the Colorado State Highway Patrol, and the Colorado Department of Transportation (collectively "the state"), among others.[1] The trial court later consolidated these actions. In their amended complaints, both Plaintiffs alleged that the state was negligent in failing to maintain the highway. Ms. Hawkins specifically claimed that the state breached its duty to maintain the highway by negligently failing to install safety devices that would have prevented the boulder from falling. The Medinas, in addition to their failure to maintain claim, alleged that the state was negligent in failing to close U.S. Highway 6 to public travel, failing to warn the public that U.S. Highway 6 was unsafe for travel, and failing to recommend that the public use alternate routes.

The state, arguing that it is immune from liability under the CGIA, brought a motion to dismiss these claims for lack of subject-matter jurisdiction pursuant to C.R.C.P. 12(b)(1). The trial court denied this motion, and the state took an interlocutory appeal under CGIA section 24–10–108, 7 C.R.S. (2001). The court of appeals held that the CGIA precluded all but Plaintiffs' failure to maintain claim. *Medina v. State*, 17 P.3d 178, 182–83 (Colo.App.2000).

The CGIA waives governmental immunity in actions for injuries resulting from a failure to maintain a public highway, but not in actions for injuries solely attributable to the inadequate design of a public highway. § 24–10–106(1)(d)(I), 7 C.R.S. (2001); § 24–10–103(1), 7 C.R.S. (2001); *Swieckowski v. City of Fort Collins*, 934 P.2d 1380, 1384–86 (Colo. 1997). "Maintain" means to keep a road "in the same general state of being, repair, or efficiency as initially constructed," *Swieckowski*, 934 P.2d at 1385, whereas "design" means to "conceive or plan out in the mind." *Id.* at 1386. Logically then, the critical distinction is temporal: an injury results from a failure to maintain when it is caused by a condition of the road that develops subsequent to the road's initial design. An injury results from inadequate design, in contrast, when it is caused by a condition of the road that inheres in the design and persists to the time of the injury. The CGIA waives immunity only for the former. This construction is grounded in the legislature's expressed purpose for enacting the CGIA and best comports with our precedent interpreting it.

We agree with the court of appeals that the CGIA waives immunity in an action for injuries resulting from the state's negligent failure to maintain a public highway. We hold, however, that it is the development of a dangerous condition of a public highway, subsequent to the initial design and construction of the highway, that creates in the state a duty to return the road to "the same general state of being, repair, or efficiency as initially constructed." *Swieckowski*, 934 P.2d at 1385. Because the scope of this duty—and consequently, the scope of the waiver of immunity for its breach under the CGIA—is measured in relation to the original condition

---

1. Claims were also brought against the entities operating the charter bus. They are not parties to this appeal.

of the road, it is imperative that the first step in the court's analysis be to determine the "the general state of being, repair, or efficiency" of the road as initially constructed. Only after making this determination can the trial court ascertain whether the dangerous condition of the highway causing the injury developed through a lack of maintenance subsequent to the initial design and construction of the highway, and thus, whether immunity has been waived.

In this case, the trial court never took this first step; it never determined the "general state of being, repair, or efficiency" of the road as initially constructed. Thus, all relevant evidence necessary to the resolution of the jurisdictional issue was not before the trial court. Moreover, whether Plaintiffs' injuries were caused by the state's failure to maintain the road or whether they were attributable solely to design is a disputed issue of fact in this case. Accordingly, the trial court, and the court of appeals, erred in deciding this issue as a matter of law. Consequently, we reverse the court of appeals' conclusion that, as a matter of law, the amended complaints are sufficient to survive the state's motion to dismiss merely because they allege that the state negligently failed to maintain Highway 6. Furthermore, we remand this case to the court of appeals with directions to remand the case to the trial court with instructions that it conduct an evidentiary hearing pursuant to 12(b)(1) to determine "the general state of being, repair, or efficiency of the road" as originally constructed. This will enable the trial court to determine whether the dangerous condition causing the injury in this case was allowed to develop through a lack of maintenance subsequent to the initial design and construction of the road or whether it inhered in the design itself.

The parties also dispute whether the installation of safety devices is a product of design or maintenance. Consistent with our explanation of the state's maintenance obligation, we also hold that where the installation of safety devices is necessary to return the road to "the same general state of being, repair, or efficiency as initially constructed," then the state's duty of maintenance encom-

passes an obligation to install such devices. Whether the installation of safety devices was indeed necessary to return the road to "the same general state of being, repair, or efficiency as initially constructed" is not reflected in the record, and accordingly, we reverse the court of appeals' conclusion that the installation of such devices was outside the scope of the state's maintenance obligation in this case as a matter of law. On remand, the trial court should make this factual determination in the course of the evidentiary hearing to be held pursuant to 12(b)(1).

Finally, we hold that, as a matter of law, the CGIA does not waive immunity for claims asserting a failure to warn, failure to close the highway, or failure to suggest alternate routes. The state's negligent construction or maintenance of a highway is what triggers a waiver of immunity under the CGIA. Negligent failure to warn, to which all these claims amount, does not.

Accordingly, we affirm in part and reverse in part. Because we are unable to determine from the record: (1) the "general state of being, repair, or efficiency" of the road as initially constructed and thus when the dangerous condition causing the injury in this case arose; and (2) whether the installation of safety devices was necessary to return the road to its "general state of being, repair, or efficiency as initially constructed," and because the subject-matter jurisdiction of the trial court over these claims depends on the determination of these jurisdictional facts, we remand this case to the court of appeals with directions to remand the case to the trial court with instructions that it resolve these issues by conducting an evidentiary hearing under C.R.C.P. 12(b)(1).

## FACTS AND PROCEDURAL HISTORY

On May 25, 1996, Terri Hawkins and Jerry and Mary Medina boarded a charter bus bound for the casinos of Blackhawk and Central City. Their route was to take them through Clear Creek Canyon on U.S. Highway 6. The weather was poor; it had been raining for quite some time, and it continued to rain. As the bus approached Tunnel Two in Clear Creek Canyon, a boulder, weighing

approximately five hundred pounds, dislodged from a "cut slope" above the road. The boulder tumbled down the slope, crashed through the roof of the bus, and landed in the passenger cabin, severely injuring Ms. Hawkins and Mr. Medina. Mr. Medina later died from his injuries.

U.S. Highway 6, in the vicinity of the accident, travels alongside Clear Creek through a steep and narrow canyon. It is prone to rockfall activity. In 1991, the slopes adjacent to U.S. Highway 6 were evaluated for frequency of rockfall activity. Near the location of the accident, the slopes were rated a four on a scale from one to four, with four representing the highest likelihood of rockfall activity. A year before the accident occurred, a rain-loosened boulder twelve feet in diameter fell onto the road in approximately the same location. Just thirteen hours before the accident, another rock had fallen onto the highway about one and a half miles from the location of the accident. Accordingly, the district court found that there is "evidence of other rock slides in the same area, under the same weather conditions around the same time as this rock slide." (R. at vol. I, p. 114.)

This stretch of highway was designed with very steep highway clearance rock cuts and without shoulders or roadside ditches. These rock cuts, including the slope from which the rock fell, were carved by the state when it constructed the highway. It is also uncontroverted that, had the state installed a ditch catchment at the base of the slope, shoulders, rock bolting, wire mesh, or some combination thereof, the chance of the boulder reaching the traveled portion of the roadway would have been substantially reduced.

Although Ms. Hawkins and the Medinas each brought separate actions against the state, the trial court later consolidated these actions. In her amended complaint, Ms. Hawkins alleged that her injuries were the result of the state's negligent failure to maintain U.S. Highway 6. Specifically, she alleged that the state "breached its duty to maintain U.S. 6 by negligently failing to install safety devices that would prevent boulders from unstable slopes from falling onto the traveled portion of the highway or taking sufficient other measures to prevent boulders from falling onto the traveled portion of the highway." In their amended complaint, the Medinas, like Ms. Hawkins, alleged that the state had negligently failed to maintain U.S. Highway 6. In addition to this claim, they also alleged that the state was negligent in: (1) failing to close Highway 6 to public travel; (2) failing to warn the public that Highway 6 was unsafe for travel; and (3) failing to recommend that the public use alternate routes to Highway 6.

The state, claiming immunity under the CGIA, sought to dismiss these claims for lack of subject-matter jurisdiction pursuant to C.R.C.P. 12(b)(1). It also requested that the trial court hold an evidentiary hearing, pursuant to *Trinity Broadcasting, Inc. v. City of Westminster*, 848 P.2d 916 (Colo.1993), to resolve any disputed jurisdictional facts relevant to the determination of the immunity issue. The state basically argued that it was immune from suit in this case because "it was the design of the road and the cut slope above the road that led to the rock striking the bus," not the state's failure to maintain the highway.

Attached to the state's motion to dismiss was the affidavit of Richard D. Andrew, the state geologist in charge of evaluating the state's highways for rockfall hazards. In relevant part, the affiant states that:

[F]rom the road ... I observed a fresh area of disturbed soil which appeared to be where the rock had come from.... I hiked up a depression to the west to verify the source of the rock fall. I inspected the slope and determined the rock had naturally dislodged from the top of the cut slope. This area of the highway was designed with no shoulders, no roadside ditches and very steep highway clearance rock cuts. The design methods that would have mitigated the rock fall potential in this area would be a ditch catchment at the base of the cut slope, highway shoulders, rock bolting, wire mesh or a combination of these methods. It was the original design of the highway cut slope through this area that allowed the rock to reach the traveled portion of the road and not construction or lack of maintenance.

The trial court first addressed the state's motion for an evidentiary hearing. Concluding that *Trinity Broadcasting* did not require an evidentiary hearing "where all relevant evidence has been presented to the trial court and the underlying facts are undisputed," the trial court denied the state's motion for an evidentiary hearing and proceeded to decide the immunity issue as a matter of law. (R. at vol. II, p. 292.) Relying on *Schlitters v. State*, 787 P.2d 656 (Colo.App.1989), the trial court also denied the state's motion to dismiss. It found that "[t]he dangerous condition in which the plaintiffs were injured existed because of the government's lack of maintaining the roadway, rather than from a design perspective." (*Id.*)

The state filed an interlocutory appeal pursuant to section 24-10-108, 7 C.R.S. (2001). With respect to Ms. Hawkins's and the Medinas' failure to maintain claim, the court of appeals affirmed the trial court's order. *Medina*, 17 P.3d at 183. Acknowledging that the CGIA specifically waives the state's immunity in an action for injuries resulting from a failure to maintain a public highway, it held that because "[t]he state's motions to dismiss, and, more importantly the affidavit submitted in support of the motions, do not address this issue ... the amended complaints are sufficient to survive the state's motion to that limited extent." *Id.* With respect to the Medinas' other claims, the court of appeals reversed, holding that "there has been no waiver of governmental immunity for the state's failure to warn the highway users of hazardous conditions of the highway, issue a travel advisory, reroute traffic, or close the highway." *Id.* at 182.

The court of appeals also reversed with respect to Ms. Hawkins's claim that the state breached its duty to maintain by failing to install safety devices. *Id.* The court of appeals apparently distinguished *Schlitters* and *Belfiore v. Colorado State Dep't of Highways*, 847 P.2d 244 (Colo.App.1993), both cases holding that a plaintiff's collision with a boulder that had fallen onto the highway was the result of the state's failure to maintain, on the ground that they were decided under C.R.C.P. 12(b)(5), which controlled questions of governmental immunity prior to *Trinity Broadcasting*. Because the immunity issue in this case, in contrast, was decided after *Trinity Broadcasting* and thus pursuant to 12(b)(1), the court of appeals concluded that "the uncontradicted affidavit of the engineer is a sufficient basis upon which to conclude that the modifications suggested by Hawkins are outside the scope of the state's maintenance obligation for which immunity has been waived." *Id.* In other words, the court of appeals viewed the need for safety devices as a defect in design and thus the installation of safety devices as a design modification for which governmental immunity has not been waived.

We granted certiorari to clarify the relationship between "maintenance" and "design" under the CGIA and thereby demarcate the scope of the state's maintenance obligation.[2]

## ANALYSIS

### A. Procedural Considerations

As a preliminary matter, we address the procedural questions raised by the certiorari issues.

**1. The Difference Between 12(b)(1) and 12(b)(5) as the Standard for Determining Whether the State is Immune From Suit Under the CGIA**

 *Trinity Broadcasting* held that whether the state is immune from suit under

---

2. We granted certiorari on the following issues:

1. Whether the court of appeals erred in holding, contrary to *Schlitters v. State*, 787 P.2d 656 (Colo.App.1989) and *Belfiore v. Colorado State Dept. of Highways*, 847 P.2d 244 (Colo. App.1993), that sovereign immunity barred an injury action arising from the State's negligent failure to utilize measures to prevent boulders from falling on motorists, where it determined that such measures constituted highway design rather than highway maintenance.

2. Whether the holding of the court of appeals is inconsistent with the supreme court's holding in *Swieckowski v. City of Fort Collins*, 934 P.2d 1380 (Colo.1997) and *State v. Moldovan*, 842 P.2d 220 (Colo.1992), leading to an absurd interpretation of a state statute.

3. Whether the court of appeals erred by apparently basing its ruling on an opinion, contained in an affidavit, that addressed the ultimate issue in the case.

4. Whether a C.R.C.P. 12(b)(1) standard for the trial court's jurisdictional determination in governmental immunity cases precludes application of cases decided under a C.R.C.P. 12(b)(5) standard.

the CGIA is a question of subject-matter jurisdiction and therefore must be determined pursuant to C.R.C.P. 12(b)(1). 848 P.2d at 923; *see also City of Lakewood v. Brace,* 919 P.2d 231, 244 (Colo.1996); *Fogg v. Macaluso,* 892 P.2d 271, 276–77 (Colo.1995); *Cline v. Rabson,* 862 P.2d 1035, 1036 (Colo. App.1993). Issues concerning subject-matter jurisdiction may be raised at any time. *Sanchez v. State,* 730 P.2d 328, 331 (Colo.1986). Under C.R.C.P. 12(b)(1), the plaintiff has the burden of proving jurisdiction, *Trinity Broad.,* 848 P.2d at 925, and the trial court is authorized to make appropriate factual findings. *Brace,* 919 P.2d at 231. It "need not treat the facts alleged by the non-moving party as true as it would under C.R.C.P. 12(b)(5)." *Brace,* 919 P.2d 231; 2 James Wm. Moore, Moore's Federal Practice § 12.30[4] (3d ed.1997) (discussing identical Federal Rule of Civil Procedure 12(b)(1) and explaining that under 12(b)(1) "when a court reviews a complaint under a factual attack, the allegations have no presumptive truthfulness, and the court that must weigh the evidence has discretion to allow affidavits, documents, and even a limited evidentiary hearing to resolve disputed jurisdictional facts"). Thus, whereas Rule 12(b)(5) constrains the court by requiring it to take the plaintiff's allegations as true and draw all inferences in the plaintiff's favor, Rule 12(b)(1) permits the court "to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Trinity Broad.,* 848 P.2d at 925.

▮ The primary difference between Rule 12(b)(1) and 12(b)(5) therefore is that under Rule 12(b)(1) the trial court is permitted to make findings of fact. Under Rule 12(b)(5) it is not; it must take the allegations of the complaint as true and draw all inferences in favor of the plaintiff. The trial court still makes conclusions of law under both rules, however. Only the bases of these conclusions differ. Under Rule 12(b)(1), the trial court bases its conclusions of law on the facts it has found. Under Rule 12(b)(5), the trial court bases its conclusions of law on the allegations in the complaint. Thus, Plaintiffs are right in asserting that *Trinity Broadcasting* did not change what facts required a waiver of immunity as a matter of law, only

the requisite evidence needed to show these facts. Accordingly, the switch in *Trinity Broadcasting* to deciding CGIA immunity issues under 12(b)(1) did not affect the precedential value of legal conclusions in immunity cases decided under the prior 12(b)(5) standard.

### 2. Review of a Trial Court's 12(b)(1) Determination

▮ Because Rule 12(b)(1) permits a trial court to make its own factual findings in determining its subject-matter jurisdiction, it necessarily permits the trial court to hold an evidentiary hearing to resolve any factual dispute upon which the existence of jurisdiction may turn. *Walton v. State,* 968 P.2d 636, 641 ("When disputed facts exist regarding application of the CGIA's immunity bar, the trial court on its own motion may hold an evidentiary hearing, and it should do so upon a public entity's request."); *Swieckowski,* 934 P.2d at 1384 ("Any factual dispute upon which the existence of jurisdiction may turn is for the district court to resolve...."); *Trinity Broad.,* 848 P.2d at 924–25; 2 Moore, *supra,* § 12.30[4]. Just like any other finding of fact, an appellate court will not disturb the trial court's findings of jurisdictional fact unless they are clearly erroneous. *Springer v. City & County of Denver,* 13 P.3d 794, 799 (2000); *Walton,* 968 P.2d at 641; *Swieckowski,* 934 P.2d at 1384; 2 Moore, *supra,* § 12.30[5]. However, if all relevant evidence is presented to the trial court, and the underlying facts are undisputed, the trial court may decide the jurisdictional issue as a matter of law, in which case appellate review is *de novo. Springer,* 13 P.3d at 799; *Swieckowski,* 934 P.2d at 1384; *Trinity,* 848 P.2d at 925; 2 Moore, *supra,* § 12.30[5].

▮ Here, because it concluded that all relevant evidence had been presented and that the underlying facts were undisputed, the trial court made no findings of fact, denied the state's motion for an evidentiary hearing, and decided as a matter of law whether the undisputed facts before it constituted a waiver of immunity under the CGIA. This is nothing more than statutory interpretation, which is a question of law, and which

we therefore review *de novo. People v. Terry,* 791 P.2d 374, 376 (Colo.1990) (appellate court is not bound by the trial courts factual determinations); *Colorado Div. of Employment & Training v. Parkview Episcopal Hosp.,* 725 P.2d 787, 790 (Colo.1986) ("The construction of a statute is a question of law."); *Johnson v. Reg'l Transp. Dist.,* 916 P.2d 619, 621–22 (Colo.App.1995) (reviewing *de novo* trial court's conclusion that the plaintiff's injuries did not result from "operation" of an RTD bus as that term is used in CGIA where underlying evidence was not in dispute, and thus, trial court's conclusion was the product of statutory interpretation); *Maltby v. J.F. Images, Inc.,* 632 P.2d 646, 648 (Colo.App.1981) (in determination of jurisdiction under C.R.C.P. 12(b)(1), the trial court's interpretation of the term "public" as used in the CGIA was error as a matter of law).

## B. The Colorado Governmental Immunity Act

### 1. History and Policy of the Act

In 1971, this court decided a trilogy of cases [3] that abrogated the common law doctrine of governmental immunity. *Springer,* 13 P.3d at 798; *Bertrand v. Bd. of County Comm'rs,* 872 P.2d 223, 226 (Colo.1994). *Evans,* the last in this trilogy, recognized that determining whether, and to what extent, the state should be immune from liability is exclusively a legislative prerogative. *Evans,* 174 Colo. at 105, 482 P.2d at 972. The General Assembly responded by enacting the Colorado Governmental Immunity Act that same year. Ch. 323, sec. 1, §§ 130–11–1 to – 17, 1971 Colo. Sess. Laws 1204, 1204–1211; *Bertrand,* 872 P.2d at 226.

As reflected in the CGIA's declaration of policy, our legislature views governmental immunity as necessary for good government:

> It is recognized by the general assembly that the doctrine of sovereign immunity, whereunder the state and political subdivisions are often immune from suit for injury suffered by private persons, is, in some instances, an inequitable doctrine.... The

general assembly also recognizes that the state and its political subdivisions provide essential public services and functions and that unlimited liability could disrupt or make prohibitively expensive the provision of essential public services and functions. The general assembly further recognizes that the taxpayers would ultimately bear the fiscal burden of unlimited liability and that limitations on the liability of public entities and public employees are necessary in order to protect the taxpayers against excessive fiscal burdens.

§ 24–10–102, 7 C.R.S. (2001).

### 2. Interpretation of the Act

 Although the CGIA generally immunizes the government from tort liability, it also waives this immunity under certain limited circumstances. *See* § 24–10–106, 7 C.R.S. (2001). Thus, while on the one hand the purpose of the CGIA is to protect the public against unlimited liability and excessive fiscal burdens, its purpose on the other hand, "is to allow the common law of negligence to operate against governmental entities except to the extent it has barred suit against them." *Walton v. State,* 968 P.2d 636, 643 (Colo.1998). This balance is for the legislature alone to reach. This history of, and policy behind, the CGIA informs our analysis of the issue before us.

 Because the CGIA derogates the common law, its grant of immunity must be strictly construed. *Corsentino v. Cordova,* 4 P.3d 1082, 1086 (Colo.2000); *Bertrand,* 872 P.2d at 225–27. As a logical corollary, its waiver provisions are interpreted broadly. *Corsentino,* 4 P.3d at 1086. Nonetheless, the primary task in construing a statute is to determine and give effect to the intent of the legislature. *Bertrand,* 872 P.2d at 228; *State v. Hartsough,* 790 P.2d 836, 838 (Colo.1990). We therefore look to the statutory language, giving words and phrases their plain and ordinary meaning, and interpreting the statute in a way that best effectuates the purpose of the legislative scheme. *Springer,* 13 P.3d at 799; *Swieckowski,* 934 P.2d at 1384– 85.

---

**3.** *Evans v. Bd. of County Comm'rs,* 174 Colo. 97, 482 P.2d 968 (1971); *Flournoy v. Sch. Dist. No.*

*1,* 174 Colo. 110, 482 P.2d 966 (1971); *Proffitt v. State,* 174 Colo. 113, 482 P.2d 965 (1971).

### 3. Statutory Framework

The sole purpose of a CGIA jurisdictional inquiry conducted pursuant to C.R.C.P. 12(b)(1) is to determine whether the public entity has waived sovereign immunity. *State v. Moldovan*, 842 P.2d 220, 225 (Colo. 1992) ("[T]he effect of a waiver of governmental immunity is merely to allow the liability of the public entity to 'be determined in the same manner as if the public entity were a private person.' ") (quoting § 24–10–107, 7 C.R.S. (2001)). Section 24–10–106(1)(d)(I) waives the state's immunity in an action for injuries resulting from "[a] dangerous condition of a public highway, road, or street which physically interferes with the movement of traffic ...." § 24–10–106(1)(d)(I), 7 C.R.S. (2001). A dangerous condition in turn is defined as:

> A physical condition of a facility or the use thereof which constitutes an unreasonable risk to the health and safety of the public, which is known to exist or which in the exercise of reasonable care should have been known to exist and which condition is proximately caused by the negligent act or omission of the public entity in constructing or maintaining such facility. Maintenance does not include any duty to upgrade, modernize, modify, or improve the design or construction of a facility. For the purposes of this subsection (1), a dangerous condition should have been known to exist if it is established that the condition existed for such a period of time and was of such a nature that, in the exercise of reasonable care, such condition and its dangerous character should have been dis-

covered. A dangerous condition shall not exist solely because the design of any facility is inadequate.

§ 24–10–103(1), 7 C.R.S. (2001). Therefore, to establish a waiver of governmental immunity under section 24–10–106(1)(d)(I), a plaintiff must establish that his injuries occurred as a result of: (1) the physical condition of the public facility or the use thereof, (2) which constitutes an unreasonable risk to the health or safety of the public, (3) which is known to exist or should have been known to exist in the exercise of reasonable care, and (4) which condition is proximately caused by the negligent act or omission of the public entity in constructing or maintaining such facility. *Springer*, 13 P.3d at 799; *Walton v. State*, 968 P.2d at 644.[4]

### C. Waiver of Immunity for the State's Failure to Maintain a Public Highway

Section 24–10–106(1)(d)(I), when read in conjunction with section 24–10–103(1), waives the state's governmental immunity in an action for injuries resulting from a breach of the state's duty to maintain a public highway.[5] We have defined the duty to maintain a public highway as a duty to keep the road "in the same general state of being, repair, or efficiency as initially constructed." *Swieckowski*, 934 P.2d at 1385. Design, in contrast, means "to conceive or plan out in the mind." *Id.* Because the state has waived sovereign immunity for injuries caused by a failure to maintain a road but not for injuries solely attributable to inadequate

---

4. Our analysis considers only the fourth prong of the *Walton* test. Whether Plaintiffs in this case have satisfied the first three prongs of the *Walton* test is unclear from the trial court order. In the order, the trial court states that because the underlying facts are undisputed, it is deciding the immunity issue as a matter of law. But the order does not address the first three prongs; it only considers whether Plaintiffs' injuries resulted from an inadequate design or a failure to maintain. Nevertheless, the trial court, concluding that Plaintiffs' injuries resulted from the state's failure to maintain Highway 6, denies the state's motion to dismiss. Thus, by denying the state's motion to dismiss, the trial court necessarily found that as a matter of law, the undisputed facts satisfied the first three prongs of the *Walton* test, as well as the fourth. However, in

the very same order, the trial court denies another defendant's motion for summary judgment because it concludes that the foreseeability of the boulder falling and causing the accident is a disputed issue of material fact. Given the limited nature of our review, we assume, for the purpose of our analysis, that Plaintiffs have satisfied the first three prongs of the *Walton* test.

5. Although we recognize that negligent construction will also suffice to waive the state's immunity under the fourth prong of the *Walton* test, *Springer*, 13 P.3d at 800, neither Ms. Hawkins nor the Medinas alleged negligent construction of Highway 6 as a basis for waiver of the state's immunity under the CGIA, and we therefore do not consider it further.

design, a principled distinction between these terms is critical to a resolution of these cases.

### 1. Colorado Precedent

*Swieckowski v. City of Fort Collins*, 934 P.2d 1380 (Colo.1997), represents this court's most thorough exposition of the difference between maintenance and design. In that case, a young boy was injured while riding his bike on a newly widened section of road when the paved portion of the road abruptly ended and dropped into a steep ditch. *Swieckowski*, 934 P.2d at 1383. It was undisputed that on the day the plaintiff was injured, the roadway was in the same condition as when it was originally constructed. *Id.* at 1386. The plaintiff argued for an interpretation of "maintain" whereby the City's mere ownership of the dangerous condition causing the injury would be sufficient to render it liable to suit. *Id.* at 1385. We rejected this argument, instead defining maintain as "keeping a constructed edifice, structure, or improvement in the same general state of being, repair, or efficiency as initially constructed." *Id.* at 1386. A failure to maintain a roadway therefore, "is not a failure to keep a roadway in existence, but a failure to. restore a roadway to the state in which it was originally constructed." *Id.* In explaining our construction of the statute, we recognized that in 1992, to clarify the meaning of maintenance, the General Assembly added the following language to the definition of "dangerous condition": "Maintenance does not include any duty to upgrade, modernize, modify, or improve the design or construction of a facility." *Id.* at 1385 (holding that purpose of the amendment was to clarify the definition of the word "maintain") (quoting ch. 172, sec. 1, § 24–10–103, 1992 Colo. Sess. Laws 1115). We relied on the legislative history of this amendment to conclude that, "Under the 1992 amendment, while the government has no duty to improve a roadway, it does have a duty to repair a roadway where the roadway has changed from its original condition and this change poses a danger." *Id.*

*Swieckowski* also discussed the meaning of design under the CGIA. It explained that design, as used in the CGIA, meant "to con-

ceive or plan out in the mind." *Id.* at 1386. Accordingly, we held that because the dangerous condition was included in the conception, or plan, for the roadway improvements, the plaintiff's injuries, which occurred as a result thereof, were attributable solely to design, and thus were not injuries for which the CGIA had waived the state's immunity.

*State v. Moldovan*, 842 P.2d 220 (Colo. 1992), provides a contrast to the circumstances in *Swieckowski*. In *Moldovan*, the plaintiff was injured when his motorcycle struck a cow that had wandered onto the highway. 842 P.2d at 221–22. The state had allowed a right-of-way fence adjacent to the road to fall into disrepair, enabling the cow to gain access to the road. *Id.* at 222. We held that the plaintiff's injuries had been sustained as a result of the state's failure to maintain the fence and that therefore, the state was not immune from liability for the plaintiff's injuries. *Id.* at 225. In doing so, we reasoned that,

> [A]n improperly maintained safety device that is an integral part of a state highway system may constitute a dangerous condition on the highway that physically interferes with the movement of traffic on the paved portion of the highway and, thus, may be the basis of a tort claim against the public entity responsible for maintaining the device.

*Id.* at 224–25; *see also Stephen v. City & County of Denver*, 659 P.2d 666, 668 (Colo. 1983) (discussing the functionally integrated character of a highway system and concluding that "to construe 'dangerous condition' to be limited to the physical condition of the road surface gives too cramped a reading to the statute and ignores the purpose for which this exception to sovereign immunity was created"); *Hallam v. City of Colo. Springs*, 914 P.2d 479, 483 (Colo.App.1995) ("A dangerous condition is not limited to those conditions that have their physical source in the highway surface itself."); *cf. Swieckowski*, 934 P.2d at 1386 (reasoning that the design of a roadway does not exist in the abstract and that therefore existing physical features which are contiguous to the roadway are part of the design of an improved roadway).

The two court of appeals cases Plaintiffs reply upon, *Schlitters v. State*, 787 P.2d 656

(Colo.App.1989) and its progeny *Belfiore v. Colorado State Department of Highways*, 847 P.2d 244 (Colo.App.1993), are only marginally instructive. Both cases found a waiver of the state's immunity under the CGIA where the plaintiffs' injuries were the result of a collision between their automobiles and rocks that had fallen onto the road. However, both were also decided before *Trinity Broadcasting* and therefore pursuant to C.R.C.P. 12(b)(5) as opposed to C.R.C.P. 12(b)(1).

Thus, in *Belfiore* the primary issue for determination was "whether the complaint sufficiently stated a claim upon which relief could be granted." 847 P.2d at 245. The complaint alleged that "the plaintiff's injuries were caused by the Department's failure properly to maintain the right-of-way," or "[i]n the alternative ... that the Department [of Highways] had notice that the blasting activities on the property adjacent to the highway created a potentially dangerous condition affecting the safety of the motorists using the highway and that appropriate steps were not taken to avoid the danger." *Id.* at 246. Accordingly, *Belfiore* stands for no more than the legal proposition that if the plaintiff's injuries are the result of the state's negligent failure to maintain the right-of-way, then the CGIA waives the state's immunity in an action to recover therefor.

*Schlitters* is only slightly more helpful. There the plaintiff's complaint alleged that "the condition of the highway was dangerous, that the defendants had previous knowledge of numerous similar accidents and fatalities caused by falling boulders on this segment of [the highway], and that the defendants negligently failed to install devices that would have prevented boulders from this unstable slope from falling onto the travelled [sic] portion of the highway." 787 P.2d at 657. The court of appeals concluded that "these allegations of unreasonable risk to public health or safety are sufficient to state a claim for relief under the statutory exception to sovereign immunity." *Id.*

## 2. Defining "the same general state of being, repair, or efficiency of the road as initially constructed"

■ There is one common denominator in all the cases that discuss the difference between maintenance and design under the CGIA: The CGIA waives immunity in an action to recover injuries caused by breach of the state's duty to maintain; it does not waive immunity in an action to recover for injuries solely attributable to design. As we noted earlier, "maintain" means to keep a road in "the same general state of being, repair, or efficiency as initially constructed" whereas "design" means "to conceive or plan out in the mind." *Swieckowski*, 934 P.2d at 1385. As such, the duty to maintain can arise only after the road has been designed and constructed. Thus, whether an injury resulting from a dangerous condition of a public highway is caused by the state's failure to maintain the highway or by the inadequate design of the highway depends on the time at which the dangerous condition of the highway arose.

■ Accordingly, an injury results from a state's failure to maintain a public highway when the dangerous condition of the highway causing the injury is allowed to *develop* subsequent to the initial design and construction of the highway. *See, e.g., Moldovan*, 842 P.2d at 225 (holding that the plaintiff's injuries were a result of the state's failure to maintain and therefore finding a waiver of immunity under the CGIA where the state allowed a right-of-way fence adjacent to highway to fall into a state of disrepair thereby enabling a cow to run onto the highway and injure the plaintiff); *cf., e.g, Powell v. City of Colo. Springs*, 25 P.3d 1266, 1268 (Colo.App.2000) ("[T]he failure to keep a facility free of obstacles even if such obstacles were not part of the original design—may lead to liability on the part of a governmental entity.").

In contrast, an injury results solely from the inadequate design of a road when the dangerous condition causing the injury is inherent in the design itself and is allowed to *persist* to the time of the injury. *See, e.g., Swieckowski*, 934 P.2d at 1386 (holding that the plaintiff's injuries were attributable solely to design and therefore finding that there had been no waiver of immunity under the

CGIA where it was undisputed that the roadway causing the plaintiff's injuries was in the same condition as when it was originally constructed).

■ Determining whether a dangerous condition of a road developed subsequent to its initial design and construction and is thus attributable to the state's failure to maintain the road, or whether it inhered in the design itself and is thus attributable to the inadequate design of the road requires defining the general state of being, repair, or efficiency of the road as initially constructed. For the purposes of the CGIA, the state's acceptance of the final design—including the level of risk remaining at the end of the design phase—determines the general state of being, repair, or efficiency of the road as initially constructed. *Cf.* N.J. Stat. Ann. § 59: 4–6 cmt. (West 1992) (The "approval of plans and designs is peculiarly a function of the executive or legislative branch and is an example of the type of highly discretionary governmental activity which … should not be subject to the threat of tort liability")(discussing New Jersey's design exemption).

■ When a dangerous condition of a roadway develops subsequent to the initial construction and design of a public highway due to a failure to maintain, the state is required to take the steps necessary to return the road to the same general state of being, repair, or efficiency as initially constructed, but nothing more. This is because a failure to return the road to the same general state of being, repair, or efficiency as initially constructed would increase the risk of injury above that deemed to be acceptable during the design stage. The state therefore waives immunity in an action to recover for injuries resulting from this failure to maintain. *See, e.g., Springer*, 13 P.3d at 802 ("[T]he waiver applies if the public entity allowed the condition of the building to fall from the general state of being, repair or efficiency at which the facility was originally built."); *Swieckowski*, 934 P.2d at 1385; *Moldovan*, 842 P.2d at 225.

On the other hand, the state does not waive immunity for injuries that arise out of a dangerous condition which is inherent in the design of a highway—that is one which is intrinsic to the general state of being, repair, or efficiency of the road as initially constructed. § 24–10–103(1); *Willer v. City of Thornton*, 817 P.2d 514, 518 (Colo.1991) (holding that there was no waiver of immunity under the CGIA where the plaintiff's injuries resulted from a sharp dip in the roadway that was part of the initial design and construction of the intersection); *Szymanski v. Dep't of Highways*, 776 P.2d 1124, 1125 (Colo.App. 1989) ("Here the gist of plaintiff's complaint against the City was that there was a 'blind spot' at the intersection, that the sight lines there were improper, that the posted speed limit was too high, and that there was no warning sign advising traffic that the intersection was dangerous. Despite plaintiffs' attempts to characterize these alleged flaws as other than design defects, all of them relate to claimed inadequacies in the design of that intersection. Thus, since such claims are specifically excluded from the type of claims that § 24–10–106(1) authorizes to be asserted, the trial court properly dismissed them."). Such injuries are attributable solely to inadequate, or risky, design.

■ Accordingly, the state is not obligated to mitigate the risk of injury from a dangerous condition inherent in the design of a highway. To hold otherwise would require the state to reduce the risk of injury below the general state of being, repair, or efficiency of the road as initially constructed, and the statute specifically excludes from the state's maintenance obligation any duty to upgrade, modernize, modify, or improve the design of a facility. § 24–10–103(1); *Springer*, 13 P.3d at 802 ("The public entity has no duty under 'maintenance' to upgrade the construction of the facility.").

■ For similar reasons, designs that become inadequate over time—because of a change in use of the highway or because of changing safety standards—need not be corrected.[6] *Willer v. City of Thornton*, 817 P.2d

---

6. For example, the state's duty of maintenance does not require it to eliminate the risk attributable to the changing use of a highway because

this risk is not attributable to the road but to external sources such as an increase in traffic. *Cf. Karr v. City & County of Denver*, 677 P.2d

514, 518 (Colo.1991) (in providing that a "dangerous condition shall not exist solely because the design of any facility is inadequate," § 24–10–103(1), the General Assembly did not intend to distinguish between designs that are "inadequate" initially and designs that become "inadequate" over a period of time); *Lyons v. City of Aurora*, 987 P.2d 900, 902 (Colo.App.1999) (by amending definition of dangerous condition in 1992 to provide that "maintenance does not include any duty to upgrade, modernize, modify, or improve the design or construction of a facility" General Assembly intended "to preclude liability when a governmental entity fails to modify a facility because of changing safety standards or use") (citing *Swieckowski*); *see also Karr*, 677 P.2d at 1386 (holding that the public entity was not required to modify or improve intersection based on changing use); *Jaffe v. City & County of Denver*, 15 P.3d 806, 811 (Colo.App.2000) (holding that "while safety improvements to public golf course were both feasible and 'highly desirable,' the City's failure to take such steps did not create a 'dangerous condition' on the golf course for purposes of the [CGIA]").

In short, the state's duty to maintain is no more than a duty to hold the status quo. Some risk is inherent in every design. The state's maintenance obligation only requires it to ensure that this risk does not increase, due to degradation of the highway, beyond the general state of being, repair, or efficiency of the road as initially constructed.

■ Thus, we hold that it is the development of a dangerous condition of a highway, subsequent to its initial design and construction, that creates in the state a duty to return the road to "the same general state of being, repair, or efficiency as initially constructed." *Swieckowski*, 934 P.2d at 1385 (holding that the state "has a duty to repair a roadway where the roadway has changed from its original condition and this change poses a danger"). The duty to maintain only requires the state to rectify degradation not obsolescence. *Id.* When injury is caused by

1384, 1386 (Colo.1984) (holding that the public entity was not required to modify or improve intersection based on changing use). Accordingly, because the injury attributable to the changing use of a highway is an additional source of

a breach of this duty, the CGIA waives the state's immunity in an action to recover therefor. With these principles in mind, we turn to the facts of the case at hand.

## APPLICATION

The trial court and the court of appeals concluded that whether the state had waived immunity under the CGIA in this case could be decided as a matter of law under C.R.C.P. 12(b)(1) because all relevant evidence had been presented and because all of the underlying facts were undisputed. (R. at vol. I, p. 113.); *Medina*, 17 P.3d at 180–81. The problem with this conclusion is that it fails to distinguish among the three theories of negligence set forth in the two amended complaints at issue here. Each of these theories must be treated separately for the purpose of determining, pursuant to C.R.C.P. 12(b)(1), whether the state has waived immunity under the CGIA. The first theory is the claim by both Ms. Hawkins and the Medinas that the state negligently failed to maintain Highway 6. Second, is Ms. Hawkins's allegation that the state breached its duty of maintenance by negligently failing to install safety devices that would have prevented the boulder from falling onto the traveled portion of the highway. The third theory of negligence, failure to warn, encompasses all of the Medinas' remaining claims: (1) that the state negligently failed to close Highway 6; (2) that the state negligently failed to warn the public that Highway 6 was unsafe; and (3) that the state negligently failed to suggest alternative routes. We address each of these categories in turn.

### A. Failure to Maintain

■ With respect to Ms. Hawkins's and the Medinas' failure to maintain claim, we agree with the court of appeals that, under certain conditions, the CGIA waives the state's immunity for this claim. However, we cannot ascertain from the record before us whether these conditions have been met.

risk, it is independent of the risk of injury attributable to the road—whether caused by lack of maintenance or inadequate design—and therefore does not contribute to a determination of the overall risk of injury from the road.

■ To prove that the state has waived immunity and thus that the court has jurisdiction under 12(b)(1), Plaintiffs must prove that their injuries were caused by a breach of the state's duty to maintain the highway. Because this duty is defined as a duty to return the road to the same general state of being, repair, or efficiency as initially constructed, Plaintiffs must prove that their injuries were proximately caused by a dangerous condition of the highway that was allowed to develop through lack of maintenance subsequent to the initial design and construction of the highway. Without evidence establishing the original state of being, repair, or efficiency of the road, it is impossible to determine whether Plaintiffs' injuries were caused by a dangerous condition of the road that developed subsequent to the initial design and construction of the road or whether their injuries were caused by a dangerous condition that inhered in the design itself. The court of appeals rightly points out that neither the state's motion to dismiss nor the affidavit submitted in support thereof addresses this issue. *Medina*, 17 P.3d at 183.

■ Specifically, Plaintiffs contend that erosion of the slope occurring subsequent to its design and construction caused these injuries. The occurrence of such degradation—a dangerous condition of the public highway occurring subsequent to its initial design and construction—would trigger the state's duty to return the road to its original state of being, repair, or efficiency. Thus, any injury caused by the state's failure to comply with this duty would, again assuming the other elements of the *Walton* test have been met, fall within the waiver provisions of the CGIA.

■ We disagree, however, with Plaintiffs' assertion that Mr. Andrew's affidavit conclusively establishes that erosion loosened the boulder that caused Plaintiffs' injuries. The relevant portion of the affidavit states only that Mr. Andrew "inspected the slope and determined the rock had naturally dislodged from the top of the cut slope." (R. at vol. II, p. 189.) Although this statement could certainly be interpreted as indicating that degradation of the slope caused the boulder to dislodge, it is equally consistent with Respondent's argument that the exclusive cause of Petitioner's injuries was the original design of Highway 6. Respondents, too, rely on Mr. Andrew's affidavit. Mr. Andrew opines that "it was the original design of the highway cut slope through this area that allowed the rock to reach the traveled portion of the road and not construction or lack of maintenance." (R. at vol. II, p. 190.) Although this opinion indicates that the design of the highway contributed to Plaintiffs' injuries by allowing the rock to reach the traveled portion of the highway, it does not consider whether the state's lack of maintenance caused the rock to fall. Therefore, it is not conclusive as to the immunity issue.[7]

The design of a public roadway will often contribute to injury, but it is only when the dangerous condition is solely attributable to design that the state is immune.[8] For in-

---

7. We also note that Mr. Andrew's conclusion that it was the design of Highway 6 and not construction or lack of maintenance that allowed the rock to reach the traveled portion of the highway is arguably a legal determination. Yet, there is no indication that this geologist was even aware of the applicable legal definitions of maintenance and design. It would therefore be inappropriate to find a waiver of immunity as a matter of law based on nothing but the conclusory opinion of the state's expert. *Quintana v. City of Westminster*, 8 P.3d 527, 530–31 (Colo.App.2000) (holding that the trial court erred by not making a finding as to whether officer endangered life or property pursuant to section 42–4–108(2)(c), 11 C.R.S. (1999) and that therefore, expert's opinion that officer was reckless was not relevant to the issue to be decided to determine jurisdiction because "[a]lthough opinion testimony is not objectiona-

ble merely because it embraces an ultimate issue of fact, CRE 704, an expert may not usurp the function of the court by expressing an opinion of the applicable law or legal standard").

8. Section 24–10–103(1) provides that "[a] dangerous condition shall not exist *solely* because the design of any facility is inadequate." § 24–10–103(1), 7 C.R.S. (2001) (emphasis added); *Swieckowski*, 934 P.2d at 1386; *Willer*, 817 P.2d at 518; *Szymanski* 776 P.2d at 1125. As an exception to a waiver of governmental immunity under the CGIA, this provision must be strictly construed. *Corsentino*, 4 P.3d at 1086 ("[A]lthough we construe immunity waiver provisions broadly, we construe the exceptions to these waivers strictly because the ultimate effect of the exceptions is to grant immunity.").

stance, in *Moldovan,* the fact that the road was constructed adjacent to the pasture from which the cow escaped, or the choice of materials from which the fence was constructed, were elements of design that contributed to the plaintiff's injuries in that case, but they were not the sole cause of the plaintiff's injuries. The fact that the state allowed the fence to fall into disrepair also contributed to the plaintiff's injuries, and thus, we found a waiver of immunity under the CGIA.

Highway 6 was built without shoulders, without ditches, and with very steep highway clearance rock cuts. Inherent in such a design is a risk of rocks dislodging from the cut slope and striking vehicles traveling below. Mr. Andrew's affidavit says as much. But, like *Moldovan,* this fact does not rule out the possibility that the state's failure to maintain also contributed to Plaintiffs' injuries, for instance, by causing the rock to fall. If the state's failure to maintain did indeed contribute to Plaintiffs' injuries, then there has been a waiver of immunity under the CGIA.

Thus, we see no reason to distinguish the "cut slope" in this case from the right-of-way fence at issue in *Moldovan.*[9] Viewing a road and street system functionally as we are required to do, *Moldovan,* 842 P.2d at 224–25; *Stephen v. City & County of Denver,* 659 P.2d at 668 (Colo.1983); *Hallam v. City of Colo. Springs,* 914 P.2d 479, 483 (Colo.App. 1995), the cut slope in this case, like the fence in *Moldovan,* is an integral part of the highway to which it is adjacent. Thus, because the state constructed the slope, just as it constructed the fence, it is responsible for maintaining it. Moreover, the deterioration of the slope, like the deterioration of the fence in *Moldovan,* has the potential to in-

crease the risk of injury above that which existed at the time the road was originally designed and constructed thus implicating the state's duty to maintain. When this duty is implicated, the state must take the steps necessary to return the risk of injury to its initial level.

The real question is whether the plaintiffs' injuries were solely attributable to the risk of rocks falling inherent in the original design of the slope—or whether their injuries were at least partly attributable to an increase in the risk of rocks falling that developed over time as a result of lack of maintenance. The Andrew affidavit does not answer this question. Because the parties dispute whether Plaintiffs' injuries were caused by a lack of maintenance or were solely attributable to design and because all relevant evidence necessary to the resolution of this factual dispute has not been presented, the trial court and the court of appeals erred in concluding that this aspect of the immunity issue could be decided as a matter of law under 12(b)(1). Instead, we conclude that an evidentiary hearing is necessary to determine the original state of being, repair, or efficiency of the road as initially constructed. This will enable the trial court to determine whether the dangerous condition of the road that caused Plaintiffs' injuries developed through lack of maintenance subsequent to the road's initial design and construction or whether the injury was attributable solely to the risk inherent in the design of the road. *See Walton* 968 P.2d at 641 ("When disputed facts exist regarding application of the CGIA's immunity bar, the trial court on its own motion may hold an evidentiary hearing, and should do so upon a public entity's request."); *Lafitte v.*

9. The state seems to suggest that *Moldovan* is distinguishable because, in that case, the duty to install the right-of-way fence was imposed on the state by section 35–46–111 of the Colorado Fence Law, §§ 35–46–101 to –114, 14 C.R.S. (1984). We disagree. Whether the state's failure to maintain a right-of-way fence adjacent to a state highway renders it liable in a private tort action for injuries sustained by a highway user is indeed dependent on the nature and extent of the state's duty under the Fence Law. *See Moldovan,* 842 P.2d at 225. However, whether the state is immune and whether it is liable are two distinct inquiries. *Id.; see also State Dep't of Highways v. Mountain States Tel. & Tel., Co.,* 869 P.2d

1289, 1292 (Colo.1994) ("*Moldovan* stands ... for the proposition that if another statute is involved, and it imposes a duty upon the state, the state could be liable for breach of that duty, but only if first it is determined that sovereign immunity is waived for the activity in question."); *Hendricks v. Weld County Sch. Dist.,* 895 P.2d 1120 (Colo.App.1995) ("Once the trial court determines that a claim may proceed under a CGIA exception to immunity, the negligence liability of the public entity defendant must be determined in the same manner as if the public entity were a private person."). In *Moldovan,* the relevance of the Fence Law was limited to the latter.

*State Highway Dep't,* 885 P.2d 338, 341–42 (Colo.App.1994) (holding that a remand and possibly an evidentiary hearing was necessary for reconsideration of the plaintiff's claim for injuries allegedly caused by the state's negligent failure to maintain a public highway because court of appeals could not tell whether parties presented, and court considered, all relevant evidence on the issue); *Reynolds v. State Bd.,* 873 P.2d 1, 1 (Colo.App.1993) (remanding case to the trial court with instructions to conduct further proceedings pursuant to 12(b)(1), including an evidentiary hearing if necessary, to determine the threshold issue of whether the plaintiff's claims are barred by sovereign immunity). Therefore, we reverse the court of appeals' conclusion that, as a matter of law, Plaintiffs' allegation that the state negligently failed to maintain Highway 6 is sufficient to survive the state's 12(b)(1) motion to dismiss the amended complaints as barred by the CGIA.

## B. Installation of Safety Devices

■■■ Pursuant to our analysis, the state is required to install safety devices only where the installation of such devices is necessary to return the road to its original state of being, repair, or efficiency. Here, although he deems such devices "design methods," Mr. Andrew concedes that the installation of a "ditch catchment at the base of the cut slope, highway shoulders, rock bolting, wire mesh or a combination of these methods" "would have mitigated the rock fall potential in this area." (R. at vol. II., p. 189–90.) In addition, the affidavit of Dr. Michael West, attached to Petitioner Hawkins's Petition for Rehearing in the court of appeals [10] opines that:

> I understand that the Colorado Department of Transportation has stated that the installation of rock bolts and wire mesh is exclusively a design issue and that installation of rock bolts and wire mesh are not used to maintain or to remediate slopes subject to rockfall. In my opinion, the installation of rock bolts and wire mesh

can be used in a wide range of applications from initial design of rock slopes to maintenance and remediation of rockfall hazards. Rock bolts and wire mesh are routinely installed following initial design and construction to mitigate the risk of rockfall.

Thus, both experts agree that the installation of safety devices is sufficient to mitigate the risk of rockfall activity. What appears to be disputed is whether the installation of such devices is a function of design or maintenance. The resolution of this dispute turns on whether the installation of safety devices is necessary to return the road to its original state of being, repair, or efficiency. If installing safety devices is necessary to return the road to its original state of being, repair, or efficiency then such devices must be installed for the state to comply with its duty of maintenance. In contrast, if the installation of safety devices is not necessary to return the road to its original state of being, repair, or efficiency, then the installation of such devices is outside the scope of the state's maintenance obligation.

■■■ The state argues that the 1992 amendment to section 24–10–103(1), which clarified that "[m]aintenance does include any duty to upgrade, modernize, modify, or improve the design or construction of a facility" precludes including a duty to install safety devices within the state's maintenance obligation. We are not persuaded. *Swieckowski* makes clear that the state's duty to maintain is a duty to "keep a road in the same general state of being, repair, or efficiency as initially constructed." As our analysis explains, if the installation of safety devices is the only way to satisfy this obligation, then such devices must be installed. Thus, this amendment clarifies that the state has a duty to install such devices only where their installation is necessary to mitigate the increase in risk attributable to a dangerous condition of the road that develops subsequent to the road's initial design and construction. Otherwise, requiring the state to

---

**10.** Issues concerning subject matter jurisdiction may be raised at any time. *Sanchez v. State,* 730 P.2d 328, 331 (Colo.1986); *see also Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748

(Fed.Cir.1988) ("[T]he party asserting jurisdiction must be given an opportunity to be heard before dismissal is ordered.").

install safety devices to mitigate the risk attributable to a dangerous condition inherent in the design of the road and persisting to the time of the injury would be to mandate that the state reduce the risk of injury below that which existed when the road was initially designed and constructed. This is tantamount to imposing a duty on the state to upgrade or modernize the design of a road and is therefore prohibited by the amendment.

Because all relevant evidence necessary to resolve whether the state's maintenance obligations in this case included the installation of safety devices was not before the trial court, and because it is disputed whether the installation of such devices are a product of design or maintenance, we reverse the court of appeals' conclusion that, as a matter of law, the installation of safety devices is outside the scope of the state's maintenance obligation for which immunity has been waived.[11] Whether the state has an obligation to install such devices depends on whether they are necessary to return the road to its original state of being, repair, or efficiency as initially constructed. This question of necessity is a factual determination to be made by the trial court. *Swieckowski,* 934 P.2d at 1384 ("Any factual dispute upon which the existence of jurisdiction may turn is for the district court to resolve...."); *Trinity Broad.,* 848 P.2d at 924–25. Accordingly, we instruct the trial court to determine on remand, in an evidentiary hearing to be held pursuant to 12(b)(1), whether the installation of safety devices was necessary to return the road to its original state of being, repair, or efficiency as initially constructed.

## C. Failure to Warn

■ The Medinas' remaining claims: 1) that the state negligently failed to close Highway 6; 2) that the state negligently failed to warn the public that Highway 6 was unsafe; and 3) that the state negligently failed to suggest alternative routes of travel can be dealt with summarily. Each of these claims amounts to no more than a general allegation that the state negligently failed to warn Plaintiffs of the dangerous condition of Highway 6. Our precedent makes clear that the CGIA has not waived the state's immunity for such a claim. *See Swieckowski,* 934 P.2d at 1386; *Willer,* 817 P.2d at 517–19; *Szymanski,* 776 P.2d at 1125. Nor are these claims somehow encompassed within the state's duty of maintenance. Maintenance means keeping the road in the same general state of being, repair, or efficiency as initially constructed. Closing the road, warning of the road's dangerous condition, or suggesting alternate routes of travel do not effectuate this result and thus do not fall within the state's maintenance obligation for which immunity has been waived. Therefore, while warning the public that Highway 6 was unsafe, closing Highway 6, or suggesting alternate routes to Highway 6 may have prevented Plaintiffs' injuries in this case, failing to do so does not waive the state's immunity. Accordingly, we affirm the court of appeals' judgment dismissing these claims.

In summary, because we have concluded that all relevant evidence necessary to the resolution of the jurisdictional issue was not before the trial court and that underlying facts are in dispute, we hold that both the trial court and the court of appeals erred in deciding the immunity issue in this case as a matter of law. Here, as is often the case, whether the state has waived immunity under the CGIA is a mixed question of law and fact. *Cf. Mesa County Valley Sch. Dist. No. 51 v. Kelsey,* 8 P.3d 1200, 1204 (Colo.2000) ("Whether a claimant has satisfied the [notice] requirements of section 24–10–109(1) presents a mixed question of law and fact.... [T]he relevant facts include but are not necessarily limited to the persons, dates, and documents associated with the plaintiff's alleged injury and filing of written notice. By contrast, whether one or more documents constitute written notice of a claim under section 24–10–109(1) is a question of law

---

11. Because we hold that the state's maintenance obligation may, under the right conditions, include the duty to install safety devices, we find it unnecessary to consider whether the court of appeals erred by relying on the opinion contained in Mr. Andrew's affidavit to conclude, as a matter of law, that the installation of safety devices are outside the scope of the state's maintenance obligation.

subject to *de novo* review."). Accordingly, the trial court should have held an evidentiary hearing pursuant to 12(b)(1) to resolve those factual issues upon which jurisdiction turns, and we remand the case for this purpose. *See Walton,* 968 P.2d at 641 ("When disputed facts exist regarding application of the CGIA's immunity bar, the trial court on its own motion may hold an evidentiary hearing, and should do so upon a public entity's request."); *Lafitte v. State Highway Dep't,* 885 P.2d 338, 341–42 (Colo.App.1994) (holding that a remand and possibly an evidentiary hearing was necessary for reconsideration of the plaintiff's claim for injuries allegedly caused by the state's negligent failure to maintain a public highway because court of appeals could not tell whether parties presented, and court considered, all relevant evidence on the issue); *Reynolds v. State Bd.,* 873 P.2d 1, 1 (Colo.App.1993) (remanding case to the trial court with instructions to conduct further proceedings pursuant to 12(b)(1), including an evidentiary hearing if necessary, to determine the threshold issue of whether the plaintiff's claims are barred by sovereign immunity).

■ On remand, the trial court will have to decide whether the state's actions in this case constitute a waiver of immunity according to our interpretation of the CGIA. Given our construction of the statute, this inquiry, unlike the issue before us now, will be a mixed question of law and fact, and its determination will thus require the trial court to conduct an evidentiary hearing pursuant to 12(b)(1). Appellate review of facts found in this hearing would be on a clearly erroneous basis. Whether the facts found constitute a waiver under the CGIA, in contrast, is a question of law and would therefore be reviewed *de novo.*

## CONCLUSION

The CGIA waives governmental immunity in actions for injuries resulting from a failure to maintain a public highway but not in actions for injuries solely attributable to the inadequate design of a public highway. Thus, a principled distinction between these terms is critical. Because "maintain" means to keep a road "in the same general state of being, repair, or efficiency as initially constructed," the state's duty to maintain can only logically arise after the road has been designed and constructed. Therefore, an injury results from a failure to maintain a public highway when it is caused by a condition of the road that develops subsequent to the road's initial design. An injury results from inadequate design, in contrast, when it is caused by a condition that inheres in the design of the road and persists to the time of the injury. The CGIA waives immunity only for the former. This interpretation best comports with the statutory nature of governmental immunity in our state, with the legislature's expressed purpose for enacting the CGIA, and with our precedent interpreting the Act.

Accordingly, we affirm in part and reverse in part. Because we are unable to determine from the record: (1) the "general state of being, repair, or efficiency" of the road as initially constructed and thus when the dangerous condition causing the injury in this case arose; and (2) whether the installation of safety devices was necessary to return the road to its "general state of being, repair, or efficiency as initially constructed," and because the subject matter jurisdiction of the trial court over these claims depends on the determination of these jurisdictional facts, we remand this case to the court of appeals with directions to remand the case to the trial court with instructions that it resolve these issues by conducting an evidentiary hearing under C.R.C.P. 12(b)(1).

Justice KOURLIS concurs and Justice COATS joins in the concurrence.

Justice KOURLIS concurring:

I join the majority opinion, but write separately to discuss facts and law that bear upon the analysis, but were not directly at issue in the case.

I.

First, case law in Colorado resolves against the State the argument that the condition of a roadway includes only the traveled surface of that road. For almost twenty years, the courts have concluded that we

must look not only at the traveled surface of the roadway but also at the abutting conditions that affect that road surface—and the General Assembly has not acted to refute that conclusion. In 1983, this court decided *Stephen v. City & County of Denver*, 659 P.2d 666 (Colo.1983), in which we dealt with the argument that a "dangerous condition" was limited to the physical condition of the road itself and the State had no responsibility to maintain or deal with abutting or intrinsically related conditions. We declined to accept the argument, holding:

> Viewing a road and street system functionally, it is apparent that stop signs are integral parts of roads and highways. We believe that to construe "dangerous condition" to be limited to the physical condition of the road surface gives too cramped a reading to the statute and ignores the purpose for which this exception to sovereign immunity was created.

*Id.* at 668.

In response to that decision, the General Assembly in 1986 amended section 24–10–106(1)(d), 7 C.R.S. (2001) to provide that "physically interferes with the movement of traffic" shall not include "traffic signs, signals, or markings, or lack thereof." *See ch.* 166, sec. 5, § 24–10–106, 1986 Colo. Sess. Laws 875–76. However, when discussing that amendment in *State v. Moldovan*, 842 P.2d 220 (Colo.1992), this court stated that:

> It does not follow from these amendments, however, that a dangerous condition of a public highway that "physically interferes with the movement of traffic on the paved portion" of the highway is limited only to those dangerous conditions that have their physical source in the highway surface itself. Such a construction, in our view, cannot be squared with the statutory text adopted by the General Assembly in 1986.

*Id.* at 224. Accordingly, the court concluded that:

> Our discussion in *Stephen* of the functionally integrated character of a highway system, involving as it does not only the road surface but also other safety devices that may be physically separated from the road surface, remains as true today as it was in 1983. Consistent with the principle that a legislative grant of sovereign immunity must be strictly construed, we conclude that, exclusive of the "traffic signs, signals, or markings, or the lack thereof" expressly set forth in section 24–10–106(1)(3), an improperly maintained safety device that is an integral part of the state highway system may constitute a dangerous condition on a highway that physically interferes with the movement of traffic on the paved portion of the highway and, thus, may be the basis of a tort claim against the public entity responsible for maintaining the device.

*Id.* at 224–25.

In *Schlitters v. State*, 787 P.2d 656 (Colo. App.1989), the court of appeals rejected the contention that the *Stephen* ruling was no longer viable after amendment to the statute. Rather, that court noted that the amendments were

> meant primarily to delete traffic signs, signals, or markings, or the lack thereof from the statutory definition of the phrase "physically interferes with the movement of traffic" and that it would be specious to hold that a foreseeable condition, whether it exists on or off the road surface, that has and will continue to present a dangerous condition may exist if there has been a failure to maintain the roadside so as to avoid the presence of obstructions.

*Id.* at 657–58 (quotation marks omitted).

Similarly, in *Swieckowski v. City of Fort Collins*, 934 P.2d 1380, 1386 (Colo.1997), we concluded that the design of an improved roadway does not exist in the abstract and that therefore independent existing physical features which are contiguous to the improvement are not independent of the improved roadway but instead are part of the design of an improved roadway.

Hence, I agree with the majority that we must look at the road cut as well as the road surface in analyzing the design and maintenance questions presented in this case.

## II.

Second, I agree with the majority that the statute does not grant a waiver of immunity

for every rock that falls on any highway in Colorado. We live in a mountainous state with some roads that were dangerous when designed and constructed and remain so. However, the General Assembly has not taken steps that could allow for a more measured approach to highway maintenance.

In his affidavit, Mr. Andrew describes his role in the "Statewide Rockfall Program." The first phase of that program, he explains, consists of the visual examination and rating of the slopes adjacent to Colorado's highways. The slope from which the rock fell in this case was rated a four on a scale of one to four, indicated that it posed the most serious threat of danger from rockfall activity. In the second phase of the "Statewide Rockfall Program," Andrew prioritized the slopes rated three or four according to the severity of the hazard presented. Those sites that rated the highest for potential hazard were then scheduled for preliminary rockfall mitigation design studies. Out of the approximately 700 slopes rating a three or four, the slope in question in this case received a score of 381. Thus, there were presumably 380 sites around the state more dangerous than this one.

As reflected in the third prong of the test outlined in *Walton v. State*, 968 P.2d 636

(Colo.1998), section 24–10–103(1), 7 C.R.S. (2001) predicates a waiver of governmental immunity on a finding that the dangerous condition causing the injury was known to exist or should have been known to exist. A dangerous condition should have been known to exist, moreover, "if it is established that the condition existed for such period of time and was of such a nature that, in the exercise of reasonable care, such condition and its dangerous character should have been discovered." *Id.* at 644. Thus, section 24–10–103(1) immunizes the state from liability for injuries caused by a dangerous condition that it has not yet had an opportunity to discover. The section does not, however, appear to afford the state protection from liability for conditions of which it knows, but which—for lack of funding, resources, or time—it has not yet had an opportunity to address.

Given a finite budget, and a state with aging road systems through mountainous areas, the state should have some degree of flexibility to determine the best uses of its resources. To preserve this flexibility, other jurisdictions around the country have excepted discretionary functions from waivers of governmental immunity. We have no such exception.[1]

1. The federal government and many states have immunized the performance of discretionary functions from liability. *See* 28 U.S.C. § 2680(a) (1994) (excepting from waiver of immunity "[a]ny claim … based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused"); Alaska Stat. § 09.50.250(1) (Michie 2000) (immunity for discretionary functions); Ariz.Rev.Stat. § 26–314(A) (2000) (immunity for discretionary functions); Cal. Gov't Code § 820.2 (West 1995) (immunity for discretionary functions); Del.Code. Ann. tit. 10 § 4001(1) (Michie 1999) (immunity where an act or omission complained of arose out of and in connection with the performance of an official duty requiring a determination of policy); Ga.Code Ann. § 50–21–24(2) (1998) (immunity for discretionary functions); Haw.Rev.Stat. Ann. § 662–15(1) (Michie Supp.2000) (immunity for discretionary functions); Idaho Code § 6–904(1) (Michie 1998) (immunity for discretionary functions); Iowa Code Ann. § 669.14(1) (West 2001) (immunity for discretionary functions); Kan. Stat. Ann. § 75–6204(e) (immunity for discretionary functions), (h) (immunity for discretionary placement of traffic signals and devices), (m)

(immunity for discretionary approval of plan or design) (Supp.2000); Ky.Rev.Stat. Ann. § 44.073(13)(a) (Michie 1999) (immunity for discretionary acts or decisions); Maine Rev. Stat. Ann. tit. 14, § 8104–B(3) (West Supp.2000) (immunity for discretionary functions); Mass. Gen. Laws. Ann. ch. 258, § 10(b) (West Supp.2001) (immunity for discretionary functions); Minn. Stat. Ann. § 3.736(b) (West 2000) (immunity for discretionary functions); Miss.Code. Ann. § 11–46–9(d) (immunity for discretionary functions), (g) (immunity for "exercise of discretion in determining whether or not to seek or provide the resources necessary for the purchase of equipment, the construction or maintenance of facilities, the hiring of personnel and, in general, the provision of adequate governmental services"), (p) (immunity for exercise of discretion in approving design or plan) (Supp.2001); Neb.Rev. Stat. § 81–8,219(1) (Supp.2000) (immunity for discretionary functions); Nev.Rev.Stat. Ann. 41.032(2) (Michie 1996) (immunity for discretionary functions); N.H.Rev.Stat. Ann. § 541–B:19(c) (1997) (immunity for discretionary or planning functions); N.J. Stat. Ann. § 59:2–3 ("Discretionary activities"), (a) (immunity for discretionary functions), (b) ("A public entity is not liable for legislative or judicial action or

### III.

Hence, the cases on point in Colorado and the absence of a discretionary function exception to governmental immunity dictate the analysis in which the majority engages under these facts, and I therefore join that opinion.

I am authorized to state that Justice COATS joins in this concurrence.

inaction, or administrative action or inaction of a legislative or judicial nature."), (c) ("A public entity is not liable for the exercise of discretion in determining whether to seek or whether to provide the resources necessary for the purchase of equipment, the construction or maintenance of facilities, the hiring of personnel and, in general, the provision of adequate governmental services."), (d) ("A public entity is not liable for the exercise of discretion when, in the face of competing demands, it determines whether and how to utilize or apply existing resources, including those allocated for equipment, facilities and personnel unless a court concludes that the determination of the public entity was palpably unreasonable. Nothing in this section shall exonerate a public entity for negligence arising out of acts or omissions of its employees in carrying out their ministerial functions.") (West 1992); N.D. Cent.Code § 32–12.2–02(3)(b) (Supp.2001) (immunity for discretionary functions); Okla. Stat. Ann. tit. 51., § 155(5) (West Supp.2002) (immunity for discretionary functions); Or.Rev.Stat. § 30.265(c) (1999) (immunity for discretionary functions); 42 Pa. Cons.Stat. Ann. § 8524(3) (West 1998) (immunity for discretionary functions); S.C.Code Ann. § 15–78–60(5) (Law.Co-op.Supp.2000) (immunity for discretionary functions); Tenn.Code. Ann. § 29–20–205(1) (2000) (immunity for discretionary functions); Tex. Civ. Prac. & Rem.Code Ann. § 101.056(2) (Vernon 1997) (immunity for "a governmental unit's decision not to perform an act or on its failure to make a decision on the performance or nonperformance of an act if the law leaves the performance or nonperformance of the act to the discretion of the governmental unit"); Utah Code Ann. § 63–30–10(1) (Supp.2001) (immunity for discretionary functions); Vt. Stat. Ann. tit. 12, § 5601(e)(1) (Supp.2001) (immunity for discretionary functions); *see also United States v. Varig Airlines,* 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984) (explaining that in enacting 28 U.S.C. § 2680(a) "Congress wished to prevent judicial 'second guessing' of legislative and ad-

ministrative decisions grounded in social, economic, and political policy through the medium of an action in tort" and that therefore, "decisions requir[ing] the agency to establish priorities for the accomplishment of its policy objectives by balancing the objectives sought to be obtained against such practical considerations as staffing and funding" are within the exception); *Dalehite v. United States,* 346 U.S. 15, 34–36, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) ("The 'discretion' protected by [28 U.S.C. § 2680(a) ] is ... the discretion of the executive or the administrator to act according to one's judgment of the best course.... This includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications, or schedules of operations. Where there is room for policy judgment and decision, there is discretion."); *Mitchell v. United States,* 225 F.3d 361, (3d Cir .2000) (holding that National Park Service's choice not to repair or improve structures adjacent to a road came within discretionary function exception because the need for such repairs existed on nearly all road sections in the Park and therefore, given its restricted budget, the Service was forced to determine priorities and repair the more urgent problems first); *Cope v. Scott,* 45 F.3d 445, 451 (D.C.Cir.1995) (holding that Park Service's decision not to repave a particular section of road was within discretionary function exception because this section was thirty-third on a maintenance priority list of eighty sections @of park road and "determining the appropriate course of action would require balancing factors such as Beach Drive's overall purpose, the allocation of funds among significant project demands, the safety of drivers and other park visitors, and the inconvenience of repairs as compared to the risk of safety hazards"); *Baum v. United States,* 986 F.2d 716, 724 (4th Cir.1993) ("The decision of how and when to replace a major element of a substantial public facility is ... at bottom a question of how best to allocate resources.")